[No. D036580. Fourth Dist., Div. One. June 8, 2001.]

NICANOR ROMERO et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
RYAN N., a Minor, etc., et al., Real Parties in Interest.

1072

**Counsel**

Ford, Walker, Haggerty & Behar, Maxine J. Lebowitz and Timothy Lee Walker for Petitioners.

No appearance for Respondent.

Elaine L. Heine for Real Parties in Interest.

**Opinion**

**NARES, J.**—Plaintiff and real party in interest Ryan N. (Ryan), then 13 years of age, was sexually assaulted by another minor, defendant Joseph W. (Joseph) who was then 16 years of age,[1] while both teenagers were visiting a teenage son of petitioners and defendants Nicanor Romero and Gail Romero (together petitioners or the Romeros) in petitioners' home. Ryan's mother, real party in interest Marcellyn W. (mother or Ryan's mother), brought Ryan to the Romeros' home and left her there after telling Gail Romero that she did not leave her child anywhere without adult supervision, and Gail Romero replied that she and her husband would be at home gardening. Mother, however, gave permission for Ryan to walk with Joseph

---

[1] Joseph is not a party to the instant writ proceeding.

and other teenagers that afternoon from petitioners' home to a drugstore without adult supervision. Later that afternoon, Joseph sexually assaulted Ryan after petitioners left their home for an hour to buy pizza for the teens.

Ryan and her mother (together plaintiffs) sued the Romeros for negligent supervision and intentional infliction of emotional distress. The Romeros brought a motion for summary judgment or, alternatively, for summary adjudication, arguing (among other things) that they owed no duty to Ryan or her mother. Concluding that the Romeros owed a duty of care to plaintiffs in this matter, the court denied summary judgment, but summarily adjudicated there was no merit to plaintiffs' claims for punitive damages and intentional infliction of emotional distress.

Contending the court erred in ruling that they owed a duty to Ryan, petitioners ask this court to issue a peremptory writ of mandate commanding the court to vacate its ruling and issue a new order granting their motion for summary judgment. We adopt and apply the duty rule announced in *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 [46 Cal.Rptr.2d 73] (*Chaney*) (discussed, *post*), and hold that to the extent plaintiffs alleged the Romeros were liable for negligent supervision under a theory of *nonfeasance* for negligently failing to properly supervise Ryan and control the conduct of her assailant Joseph, the Romeros did not owe a duty of care to supervise Ryan or take other measures to protect her against Joseph's sexual assault because there is no evidence from which the trier of fact could find that the Romeros had prior actual knowledge that Joseph had a propensity to sexually assault female minors. Balancing the duty factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] (*Rowland*), we also hold that to the extent plaintiffs alleged the Romeros were liable for negligent supervision under a theory of *misfeasance* and principles of ordinary negligence, the Romeros again owed no duty of care to Ryan. Consequently, petitioners were entitled to summary judgment. We grant the petition.

## FACTUAL BACKGROUND

The facts are largely undisputed. At the time of the April 1999 incident from which the instant action arose (the incident), Ryan was 13 years of age and attending middle school in the 8th grade, and Joseph was 16 and attending high school in the 11th grade. About two weeks before the incident, Ryan met Joseph at Skateworld, where she gave him her phone number. When Joseph phoned Ryan the next day, her mother asked her who had called. Ryan told her mother that she had met Joseph at Skateworld, and he was 16 years old and in the 11th grade. Joseph called Ryan every

evening, and mother sometimes answered the phone. Mother approved of his calls to Ryan and later met Joseph. She thought he was a nice young man.

The Romeros first met Joseph about a year prior to the incident, after their teenage son Elijah befriended him. During that year, Joseph visited the Romeros' home once or twice per month, he spent the night there about eight times, and sometimes he went to church with the Romeros.

Prior to the incident, Joseph had a long history of school misconduct, including sexual harassment of female students, fighting, and other misbehavior that resulted in numerous detentions and suspensions. He had been arrested and charged with vandalism and violating curfew. Gail Romero was aware of Joseph's curfew violations, but there is no evidence the Romeros knew about the arrests and Joseph's misconduct in school. Prior to the incident, Ryan and her mother had never met, and did not know, the Romeros.

Sometime during the morning of April 18, 1999, the Romeros' son, Elijah, met with Joseph, who asked whether Ryan could come over to the Romeros' house. Elijah asked his mother, Gail Romero, for permission to invite Joseph and Ryan over to the house.

Later that morning, Joseph phoned Ryan and asked her whether she wanted to get together with him. While still on the phone with Joseph, Ryan asked her mother for permission, and her mother took the phone and spoke with Joseph. Mother gave her permission, and they decided Ryan and Joseph would "hang out" together at the Romeros' house, and Joseph gave her directions.

After making these arrangements with Joseph, mother and her live-in boyfriend drove Ryan to the Romeros' home and arrived at about 3:00 p.m. Upon their arrival, Gail Romero came out of the house, and she and mother introduced themselves and spoke for about 20 minutes. During this conversation, Ryan was standing next to her mother.

Mother asked Gail Romero whether Ryan could stay there and visit with Joseph and other minors present. Mother said, "I do not leave my child anywhere without adult supervision," and asked, "Are you going to be home?" Gail Romero replied, "Yes, we're just going to be in the backyard gardening." Gail Romero then asked mother whether it was okay for Ryan and the other teens to walk to the Thrifty Drug Store during her visit at the Romeros' home, and mother gave her approval.

After telling Gail Romero she would return at 5:00 p.m., mother and her boyfriend left. Ryan, Joseph and the other teens walked to the Thrifty Drug

Store and returned to the Romeros' home. Gail Romero supervised the teens by checking several times to see what they were doing. Gail Romero felt she needed to care for Ryan while she was in her home, but she also felt Ryan was safe with the other teens who were there.

*The Assault*

About 4:30 p.m., the Romeros left to buy the teens a pizza. They were gone for about an hour.

While the Romeros were gone, Joseph sexually assaulted Ryan inside a bedroom in the Romeros' home. Joseph later entered a plea in juvenile court admitting one count of committing a lewd and lascivious act upon a child under the age of 14 years, a felony, in violation of Penal Code section 288, subdivision (a).

### PROCEDURAL BACKGROUND

Ryan and her mother filed their original complaint in October 1999. In their operative third amended complaint, they alleged a total of 16 causes of action, naming Joseph, his father and mother, the Romeros, and the local public school district as defendants. Plaintiffs asserted three tort claims against the Romeros: Negligent supervision (seventh cause of action, alleged by Ryan alone), and two counts of intentional infliction of emotional distress (12th cause of action, alleged by Ryan; and 14th cause of action, alleged by Ryan's mother). Plaintiffs sought both compensatory and punitive damages.

### A. *Ryan's Claim for Negligent Supervision*

In support of her claim for negligent supervision, Ryan alleged in paragraph 36 of her amended pleading that on the date in question, the Romeros invited her into their home, and they were "entrusted with [the] responsibility of caring for [her] physical and emotional well being." She further alleged that the Romeros "represented to plaintiffs that their home was safe and that [Ryan] would not be exposed to harm or unreasonable risks while under their supervision." Ryan also asserted that she was a minor of "tender years" and dependent on the Romeros for protection from harm and unreasonable risks.

In paragraph 37, Ryan alleged that, "[a]s a result of the *special relationship* created between [the Romeros] and [her], as alleged in paragraph 36, [the Romeros] owed a duty to [her] to properly supervise her and protect her from harm and unreasonable risks while she was entrusted in their care and invited into their home." (Italics added.)

In paragraph 38, Ryan asserted that the Romeros "knew or should have known" that Joseph was "engaging in abnormal sexual behavior with minors"; that Joseph was "experiencing mental problems and was not in control of his mental state or his actions"; and that "due to his abnormal behavior and mental problems," Joseph was "acting in reckless disregard for the safety of others" and was "engaging in, or wished to engage in acts of sexual misconduct with [her]." Ryan also alleged that the Romeros "negligently failed to properly supervise and protect [her] from harm and unreasonable risks by failing to prevent [Joseph] from committing acts of sexual molestation on [her] or warn plaintiffs of the same." She also asserted that the Romeros negligently failed to warn her and her mother of Joseph's "abnormal sexual behavior, mental problems and unlawful sexual contact with [her]."

In paragraph 39, Ryan alleged that the Romeros breached their duty of care to her by failing to properly supervise and protect her from harm and unreasonable risks by "failing to prevent [Joseph] from committing acts of sexual molestation on [Ryan] or warn plaintiffs of the same." She also averred that as a result of the Romeros' alleged negligent supervision and failure to warn and protect her, Joseph sexually molested her in the Romeros' home.

B. *Romeros' Motion for Summary Judgment or Summary Adjudication*

The Romeros brought a motion for summary judgment or, alternatively, for summary adjudication, arguing (among other things) that they owed no duty to Ryan or her mother. Concluding that the Romeros owed a duty of care to plaintiffs in this matter, the court denied the summary judgment motion, but summarily adjudicated that there was no merit to plaintiffs' claims for intentional infliction of emotional distress and punitive damages.[2]

This petition followed. We stayed the proceedings and issued an order to show cause. Ryan filed a written response to the Romeros' petition.

---

[2]In its written order, the court explained its reasoning: "Defendants Nicanor Romero and Gail Romero's motion for summary adjudication that they owed the Plaintiffs no duty is denied. [¶] It is undisputed that before leaving her minor daughter with the Romeros, [mother] asked Gail Romero whether she would be home and [Gail] Romero confirmed she would. . . . [Mother] testified she told [Gail] Romero she did not leave her daughter anywhere without adult supervision and that she would take Ryan with her if [Gail] Romero was not going to be home. . . . [Gail] Romero again confirmed she would be home. . . . Notwithstanding these representations, the Romeros left the residence for approximately one hour to pick up a pizza. . . . It was during this time that the alleged incident occurred. [Ryan's] age, coupled with the representations by [Gail] Romero and the fact the harm was foreseeable, is sufficient to impose a duty on these Defendants."

## Standard of Review

■ In evaluating the propriety of a denial of a summary judgment motion or a motion for summary adjudication, our review is de novo, and we independently review the record before the trial court. (See *Buss v. Superior Court* (1997) 16 Cal.4th 35, 60 [65 Cal.Rptr.2d 366, 939 P.2d 766]; *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1506-1507 [82 Cal.Rptr.2d 368].) In practical effect, we assume the role of a trial court and apply the same rules and standards that govern a trial court's determination of a motion for summary judgment or summary adjudication. (*Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1121-1122 [63 Cal.Rptr.2d 359]; *Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 385 [62 Cal.Rptr.2d 803].)

Under Code of Civil Procedure section 437c, subdivision (c), a motion for summary judgment shall be granted if all the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of law. Because a ruling on a summary judgment motion involves pure questions of law, "we are required to reassess the legal significance and effect of the papers presented by the parties in connection with the motion." (*Ranchwood Communities Limited Partnership v. Jim Beat Construction Co.* (1996) 49 Cal.App.4th 1397, 1408 [57 Cal.Rptr.2d 386].) We strictly construe the evidence of the moving party and liberally construe that of the opponent, "and any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion." (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392].)

A motion for summary adjudication "shall proceed in all procedural respects as a motion for summary judgment." (Code Civ. Proc., § 437c, subd. (f)(2).) Code of Civil Procedure section 437c, subdivision (f)(1) provides in part:[3] "*A party may move for summary adjudication as to . . . one or more issues of duty*, if that party contends that . . . one or more defendants . . . *did not owe a duty* to the plaintiff or plaintiffs. A motion for

---

[3]Code of Civil Procedure section 437c, subdivision (f)(1) provides in its entirety: "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or that there is no merit to an affirmative defense as to any cause of action, or both, or that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."

summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an *issue of duty*." (Italics added.)

DISCUSSION

In their petition, the Romeros argue that the court erred in ruling that they owed a duty to Ryan. We are thus called upon to determine the scope of the duty of care that adults owe to teenagers they invite into their homes to supervise and protect them against assaults by other teenage invitees during their visits.

### A. *Applicable Legal Principles*

■ " 'A tort, whether intentional or negligent, involves a violation of a *legal duty*, imposed by statute, contract or otherwise, owed by the defendant to the person injured. . . .' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292 [253 Cal.Rptr. 97, 763 P.2d 948] (*Nally*), quoting 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 6, p. 61.) Absent a legal duty, any injury is an injury without actionable wrong. (See 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 6, p. 61 ["Without such a duty, any injury is 'damnum absque injuria,'—injury without wrong"].) "Duty, being a question of law, is particularly amenable to resolution by summary judgment. [Citation.]" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 465 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*).) "While it is the province of the jury, as trier of fact, to determine whether an unreasonable risk of harm was foreseeable under the particular facts of a given case, the trial court must still decide as a matter of law whether there was a duty in the first place, even if that determination includes a consideration of foreseeability. [Citations.]" (*Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 214 [219 Cal.Rptr. 845].)

Here, the court's rulings, if affirmed, would permit this action to proceed against the Romeros on the plaintiffs' seventh cause of action for negligent supervision based on their alleged failure to protect Ryan from being sexually assaulted by Joseph in the Romeros' home. ■ "To establish liability in negligence, it is a fundamental principle of tort law that there must be a *legal duty* owed to the person injured and a breach of that duty which is the proximate cause of the resulting injury. [Citation.]" (*Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 114 [11 Cal.Rptr.2d 468] (*Jacoves*), italics added.)

As we explained in another case, "[a] person is ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the

absence of a *special relationship* of custody or control." (*Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1564 [50 Cal.Rptr.2d 399], italics added, citing *Nally, supra,* 47 Cal.3d at p. 293.) We also explained in *Roman Catholic Bishop* that "[w]here . . . a 'complaint alleges injuries resulting from the *criminal acts of third persons* . . . "the common law, reluctant to impose liability for *nonfeasance,* generally does not impose a duty upon a defendant to control the conduct of another [citations], or to warn of such conduct [citations], unless the defendant stands in some *special relationship* either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct. [Citations.]" ' [Citation.]" (*Roman Catholic Bishop, supra,* 42 Cal.App.4th at p. 1564, second italics added, original remaining italics; see also *Rodriguez v. Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 712 [230 Cal.Rptr. 823] (*Rodriguez*); *Pamela L. v. Farmer* (1980) 112 Cal.App.3d 206, 209 [169 Cal.Rptr. 282] (*Pamela L.*); *Chaney, supra,* 39 Cal.App.4th at p. 157; *Eric J. v. Betty M.* (1999) 76 Cal.App.4th 715, 727 [90 Cal.Rptr.2d 549].)

This well-established principle of California tort jurisprudence, which may be appropriately referred to as the *"no duty to aid"* rule, is "based on the concept that a person should not be liable for *'nonfeasance'* in failing to act as a 'good Samaritan.' It has no application where the defendant, through his or her own action (*misfeasance*) has made the plaintiff's position worse and has created a foreseeable risk of harm from the third person. In such cases the question of duty is governed by the standards of ordinary care. [Citations.]" (*Pamela L., supra,* 112 Cal.App.3d at p. 209, italics added, citing *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36] (*Weirum*) and *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435, fn. 5 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166].) Stated more simply, as a general rule, California tort law does not require people to be Good Samaritans, and ordinarily does not impose liability for mere nonfeasance.

"Misfeasance is the improper performance of an act that is otherwise proper and nonfeasance is the nonperformance of an act that should be performed." (*Jacoves, supra,* 9 Cal.App.4th at p. 114, fn. 16.) "Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." (*Weirum, supra,* 15 Cal.3d at p. 49.) "[N]onfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention. [L]iability for *nonfeasance* is largely limited to those circumstances in which some *special relationship* can be established. If, on the other hand, the act complained of is one of *misfeasance,* the question of duty is governed by the *standards of ordinary care* . . . ." (*Ibid.,* italics added.)

Whether a defendant owed a duty of care to an injured plaintiff is a question of law, and the existence of a duty depends on the foreseeability of the risk and a weighing of policy considerations for and against imposition of liability. (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1072 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) "As a general rule, each person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . .' " (*Parsons, supra,* 15 Cal.4th at p. 472, quoting *Rowland, supra,* 69 Cal.2d at p. 112, and citing Civ. Code, § 1714.)[4] "Whether a given case falls within an exception to this general rule, or whether a duty of care exists in a given circumstance, 'is a question of law to be determined on a *case-by-case basis.*' [Citation.]" (*Parsons, supra,* 15 Cal.4th at p. 472, italics added.)

### B. *No Duty Under a Nonfeasance/Special Relationship Theory*

Applying the foregoing legal principles, we first conclude that to the extent plaintiffs alleged the Romeros were liable for negligent supervision under a theory of *nonfeasance* for negligently failing to properly supervise Ryan and control the conduct of her assailant Joseph, the undisputed material facts establish that the Romeros assumed a "special relationship"[5] with Ryan and Joseph when they invited the minors into their home. Under the circumstances of this case, however, we also conclude that the existence of such a special relationship was insufficient to impose a duty of care on the Romeros. For reasons we shall explain, we hold that notwithstanding the special relationship between the Romeros and the teenage invitees, the Romeros did not owe a duty of care to supervise Ryan at all times during her visit, to warn her, or to protect her against Joseph's sexual assault, because there is no evidence from which the trier of fact could find that the Romeros had prior actual knowledge of Joseph's propensity to sexually assault female minors.

### 1. *Special relationship*

"Whether a relationship is determined to be special for the purpose of imposing an affirmative duty on one party to act on behalf of the welfare of another, will depend on a variety of factors not yet fully defined and, to no small extent, on important policy considerations." (*Rodriguez, supra,* 186 Cal.App.3d at p. 713.) The courts in this state have held that an adult who invites a minor into his or her home assumes a special relationship

---

[4]Civil Code section 1714, subdivision (a) provides in part: "(a) Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself."

[5]See footnote 6, *post.*

with that youngster based on the minor's vulnerability to third party misconduct and dependence on the adult for protection from risks of harm while in the home. (*Pamela L., supra,* 112 Cal.App.3d at p. 211; *Chaney, supra,* 39 Cal.App.4th at p. 157.)[6]

Here, the undisputed material facts establish that Ryan was 13 years of age when her mother drove her to the Romeros' home, and Gail Romero, after speaking with Ryan's mother for about 20 minutes, invited Ryan to spend the afternoon there visiting with Joseph, who was 16 years of age, and the Romeros' teenage son Elijah. The undisputed facts also show that the Romeros had also given permission to Elijah to invite Joseph over to the house that same afternoon. We conclude that by inviting Ryan and Joseph to their home, the Romeros assumed a special relationship with both Ryan and Joseph as a matter of law.

> 2. *Under the Chaney Duty Rule, Reasonable Foreseeability of Risk Requires Actual Knowledge*

Our inquiry as to whether the Romeros owed a duty to Ryan under a nonfeasance theory of liability, however, does not end with our conclusion that the Romeros assumed a special relationship with both Ryan and Joseph by inviting them into their home. We have been unable to find decisional authority that addresses the specific question of the scope of the duty that an adult, who is sued for negligent supervision under a theory of nonfeasance, owes to an injured invitee minor to prevent another invitee minor from sexually assaulting that minor in the defendant's home. We believe, however, that sound public policy requires that where one invitee minor sexually assaults another in the defendant's home, the question of whether the defendant owed a duty of reasonable care to the injured minor depends on whether the assailant minor's conduct was *reasonably foreseeable*, but that conduct will be deemed to have been reasonably foreseeable only if the defendant had *actual knowledge* of the assaultive propensities of the teenage assailant.

---

[6]The Court of Appeal in *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 [97 Cal.Rptr.2d 12] (*Juarez*) recently explained that, "[g]enerally, a greater degree of care is owed to children because of their lack of capacity to appreciate risks and avoid danger. [Citation.] Consequently, California courts have frequently recognized *special relationships* between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties. Recognized special relationships include an operator of a preschool or daycare center to the children in attendance [citation]; a school district to a mother whose child was sexually molested by another student because the school stood in loco parentis while the child was in attendance [citation]; and the wife of a sexual offender to children she invited to play in her home because '[b]eing of tender years they were particularly vulnerable to this sort of misconduct and not fully able to protect themselves against it. [Citation.]' [Citation.]" (*Id.* at p. 410, italics added.)

In this regard, the *Chaney* decision (*supra,* 39 Cal.App.4th 152) provides valuable guidance. In that case the plaintiff, a 22-year-old woman, brought suit against a man who she alleged had sexually assaulted her in his home over a period of many years beginning when she was 10 years of age. The plaintiff also brought a claim for negligent supervision against the man's wife on the theory that she caused the plaintiff to suffer damages by negligently supervising her while she was in the defendants' home. (*Id.* at p. 155.) The wife sought a writ of mandate directing the trial court to set aside an order overruling her demurrer. (*Id.* at pp. 154-155.) After explaining the California "no duty to aid" rule (discussed, *ante*), the Court of Appeal recognized that the defendant wife had assumed a special relationship with the plaintiff when she and her husband invited the plaintiff into their home, but held that the trial court should have sustained the defendant wife's demurrer without leave to amend on the ground the plaintiff had failed to state sufficient facts from which the trier of fact could infer that the wife "*must have known* that her husband was engaging in, or wished to engage in, acts of sexual misconduct with a minor." (*Id.* at p. 158, original italics.) The *Chaney* court stated that "public policy requires that where a child is sexually assaulted in the defendant wife's home by her husband, the wife's duty of reasonable care to the injured child depends on whether the husband's behavior was reasonably foreseeable." (*Id.* at p. 157.) The court also explained that "[*w*]*ithout knowledge of her husband's deviant propensities, a wife* will not be able to foresee that he poses a danger and thus *will not have a duty* to take measures to prevent the assault." (*Ibid.,* italics added.)

The *Chaney* court then adopted a *"must have known"* test (hereafter the *Chaney* duty rule) for determining whether the defendant wife owed a duty of care to the plaintiff after inviting her into the home when she was a child. Specifically, the Court of Appeal in *Chaney* held that "[a]lthough a wife's knowledge may be proven by circumstantial evidence, such inference must reflect the wife's *actual knowledge and not merely constructive knowledge or notice.* '[A]ctual knowledge can be inferred from the circumstances only if, in the light of the evidence, such inference is not based on speculation or conjecture. Only where the circumstances are such that the defendant *"must have known"* and not "should have known" will an inference of actual knowledge be permitted.' [Citation.]" (*Chaney, supra,* 39 Cal.App.4th at p. 157, italics added.) ■ In other words, under the *Chaney* duty rule a defendant spouse who assumed a special relationship with a minor by inviting the minor into his or her home will be deemed to have owed no duty of care to take reasonable measures to protect the minor against a sexual assault in the home by the other spouse unless the evidence and surrounding circumstances establish that the defendant had actual knowledge (i.e., must have known) of the offending spouse's assaultive propensities.

The Court of Appeal in *Chaney* next addressed the question of what facts the plaintiff was required to allege to show that the defendant wife had actual knowledge that her husband harbored deviant propensities that could cause him to sexually molest a child. (*Chaney, supra,* 39 Cal.App.4th at p. 157.) Noting that *Pamela L., supra,* 112 Cal.App.3d 206, was "instructive," the *Chaney* court explained that although the plaintiffs in *Pamela L.* "did not allege that the defendant wife actually knew her husband was engaging in acts of molestation, they alleged facts (knowledge of prior instances of sexual molestation on the part of the husband) which demonstrated that she knew about her husband's deviant propensities." (*Chaney, supra,* 39 Cal.App.4th at p. 158, citing *Pamela L., supra,* 112 Cal.App.3d. at pp. 208-209.)

We adopt and apply the *Chaney* duty rule and hold as a matter of law that an adult defendant who assumed a special relationship with a minor by inviting the minor into his or her home will be deemed to have owed a duty of care to take reasonable measures to protect the minor against an assault by another minor invitee while in the defendant's home when the evidence and surrounding circumstances establish that the defendant had *actual knowledge* of, and thus *must have known*, the offending minor's assaultive propensities. Under the California "no duty to aid" rule (discussed, *ante*), no liability may be imposed on such a defendant for negligent supervision of an injured minor invitee under a nonfeasance theory of liability solely upon evidence that the defendant had *constructive* knowledge or notice of, and thus "should have known" about, the minor assailant's assaultive propensities.

Were we to hold otherwise, parents who invite into their homes teenage minors they do not know intimately would face lawsuits and potentially devastating financial liability in tort in the event one invitee minor assaults another under circumstances in which the assaultive propensities of the offending teenager were not known to them. Parents possessing any information suggesting that a teenager that they or their own children may wish to invite into the home may have been involved in physical conduct that resulted, for example, in disciplinary action at school would be required to conduct an investigation in order to protect themselves against potential liability. They would be hampered in their investigative efforts by legitimate and well-established rules of confidentiality regarding juvenile matters. In the event such parents were to invite the minor into their home, they would be required to continually and personally provide the closest supervision during the minor's entire visit in order to minimize the risk of tort liability. Such a rule would impose unwarranted burdens and an unjustifiable risk of tort liability on families with teenage children.

We reject plaintiffs' contention that under *Pamela L., supra,* 112 Cal.App.3d 206, and *Chaney, supra,* 39 Cal.App.4th 152, the Romeros' act

of inviting Ryan and Joseph into their home, standing alone, constituted the undertaking or assumption of a duty of care to remain at home and supervise Ryan to ensure her safety during the time Ryan was in the home. As we have explained, in actions such as the instant one in which a teenage invitee assaulted by another teenage invitee seeks to impose negligent supervision liability based upon a nonfeasance theory on an adult who invited the teens into the home, the special relationship the adult assumed by inviting the child into the home, standing alone, is insufficient as a matter of law to impose on the adult a duty of care to protect the injured minor. In addition to the special relationship created by the invitation of the minor into the home, we hold there must also be evidence showing facts from which the trier of fact could reasonably infer that the adult had prior *actual knowledge*, and thus *must have known*, of the offender's assaultive propensities. (See *Chaney, supra,* 39 Cal.App.4th at p. 157.)

> *Juarez*

Ryan contends the recent decision in *Juarez, supra,* 81 Cal.App.4th 377, sets forth the applicable case law for determining whether the Romeros owed Ryan a duty of care to protect her against Joseph's sexual assault in this matter. Ryan's reliance on *Juarez* is misplaced.

In *Juarez*, a former member of a Boy Scouts troop brought an action for negligent supervision (among other tort claims)[7] against the Boy Scouts of America, Inc. (the Scouts) and a local church, alleging that a scoutmaster of the troop had repeatedly sexually molested him during officially sanctioned scouting events when the defendants knew or should have known of the scoutmaster's deviant propensities. (*Juarez, supra,* 81 Cal.App.4th at pp. 385-386.) The trial court granted summary judgment in favor of the Scouts and the church on the ground the plaintiff had failed to raise a triable issue of fact suggesting the defendants had prior notice of the scoutmaster's propensity to molest children, or that facts providing such notice were available to the defendants. (*Id.* at p. 386.)

---

[7]The *Juarez* court explained the various claims that the plaintiff alleged in his complaint. "Juarez's complaint contained causes of action based on breach of fiduciary duty, various forms of negligence, and intentional infliction of emotional distress. An additional cause of action was stated against the Church for premises liability. Juarez alleged that the Scouts and the Church were responsible for the damages he sustained as the result of [the scoutmaster's] actions. Juarez specifically claimed the Scouts and the Church were *negligent* in: (1) hiring [the scoutmaster] without conducting a proper background check; (2) *failing to* monitor and *supervise him so that young male scouts would be protected from sexual molestation*; (3) failing to properly manage, oversee, and educate Troop 255; and (4) doing nothing to stop [the scoutmaster] from engaging in inappropriate sexual conduct with young male scouts even after they knew or should have known of his deviant propensities." (*Juarez, supra,* 81 Cal.App.4th at pp. 385-386, italics added.)

A careful review of the *Juarez* decision shows that it favors petitioners in the instant case, rather than Ryan who relies upon it. Addressing the plaintiff's theory that the Scouts were liable for negligence in the selection, *supervision* and retention of the scoutmaster who allegedly molested him, the Court of Appeal began its analysis by stating that "[t]he conclusive determination that there was no information accessible to the Scouts that would cause them to suspect that [the scoutmaster] had a propensity to molest children is fatal to Juarez's causes of action based on these theories, even if such a common law duty existed." (*Juarez, supra*, 81 Cal.App.4th at p. 395.) In a footnote, the *Juarez* court stated that for purposes of its discussion, it assumed "without deciding" that the defendants owed the plaintiff a duty "to use due care in selecting, retaining, and *supervising*" the scoutmaster who had allegedly molested him. (*Id.* at p. 395, fn. 5, italics added.) Because the *Juarez* court did not decide whether the defendants in that case owed a duty to supervise, and in the instant case Ryan supports her claim for negligent supervision by relying on *Juarez* for the proposition that the Romeros owed Ryan a duty to supervise, we conclude that her reliance on *Juarez* in this matter is misplaced.

The *Juarez* court continued its analysis of the negligent supervision claim by discussing and applying the *Chaney* duty rule (*Chaney, supra*, 39 Cal.App.4th at pp. 157-158). (*Juarez, supra*, 81 Cal.App.4th at p. 396.) The Court of Appeal affirmed the grant of "summary judgment" on the cause of action for negligent supervision (among other things), stating that "[w]hile the undisputed facts show with certainty that Juarez was seriously harmed by [the scoutmaster's] misconduct, those same undisputed facts establish that there was nothing in [the scoutmaster's] background and nothing that was made known to the Scouts during his tenure as scoutmaster . . . that could be deemed a specific warning that [he] posed an unreasonable risk to minors." (*Id.* at p. 397.)

Thus, although the *Juarez* court did not decide whether the defendants in that case owed the plaintiff a duty to use due care in supervising him to protect him against being sexually molested by his troop's scoutmaster, it concluded there was no merit to the claim for negligent supervision because the plaintiff had failed to present evidence showing there was a triable issue of material fact whether the defendants had actual knowledge that the scoutmaster had a propensity to molest children.

Ryan asserts that the Court of Appeal in *Juarez* "held the Scouts owed a duty to the boy who was molested because it was *foreseeable* that this harm could occur although it was not *probable*." (Original italics.) She also states that the *Juarez* court "*specifically recognized* that the Scouts had *no prior*

*knowledge of this particular Scout Master's proclivity to molest* young boys." (Original italics.)

Ryan appears to be implying that, in the instant case, this court should affirm the court's ruling that the Romeros owed her a duty of care because under the *Juarez* decision a duty may be found absent any facts showing that the Romeros had actual knowledge of Joseph's propensity to sexually assault teenage girls. To the extent Ryan is relying on *Juarez* for such purpose, we conclude her reliance is again misplaced. The Court of Appeal in that case independently reviewed the trial court's order granting the summary judgment motion brought by the Scouts and the church and reversed the summary judgment, stating that "the trial court properly granted summary judgment on all of Juarez's causes of action *except one.*" (*Juarez, supra,* 81 Cal.App.4th at p. 385, italics added.) As already discussed, the *Juarez* court held there was no merit to the claim for *negligent supervision* because the plaintiff had failed to present evidence that the defendants had *prior actual knowledge* of the scoutmaster's propensity to sexually molest children. (*Id.* at p. 397.) The Court of Appeal held that the only viable cause of action was a claim for failure to protect the plaintiff, who had recently emigrated from Honduras and spoke only Spanish when he joined the Scouts, based on a *duty to educate and train* adult volunteers, parents, and the scouts themselves, through effective implementation of the Scouts' own comprehensive youth protection program and related training materials, on how to detect and prevent sexual molestation by scouting volunteers. (*Id.* at pp. 385, 397-400, 409-410.)

Because the specific duty of care recognized in *Juarez* is not implicated in the instant case, Ryan's reliance on that case is unavailing.

### 3. *Application of the Chaney Duty Rule*[8]

Reviewing de novo the court's denial of the Romeros' summary judgment motion, and applying the *Chaney* duty rule (discussed, *ante*) to the instant case, we conclude that although the undisputed material facts establish that the Romeros assumed a "special relationship" with both Ryan and Joseph

[8]In her response to the petition, Ryan asserts that the parties did not raise the "Good Samaritan theory" during the summary judgment proceeding, and petitioners are "now attempting to distract" this court "from the issues at hand by placing petitioners in the shoes of a Good Samaritan." The record shows, however, that the factual allegations in plaintiffs' operative complaint raised the issue of whether the Romeros were liable under a theory of nonfeasance for failure to use due care in supervising Ryan and protecting her from a third party's sexual assault upon her. The record also shows that the Romeros' memorandum of points and authorities in support of their summary judgment motion discussed the duty rule announced in *Chaney, supra,* 39 Cal.App.4th 152.

when they invited the minors into their home, Ryan failed to meet her burden of presenting any direct or circumstantial evidence of facts from which the trier of fact could reasonably infer that the Romeros *must have known* of Joseph's assaultive propensities before he sexually assaulted her. Accordingly, we also conclude as a matter of law that the Romeros did not owe a duty to supervise or otherwise protect Ryan against Joseph's sexual assault.

In support of her negligent supervision claim, Ryan's allegation in paragraph 38 of the operative third amended complaint that the Romeros *"knew or should have known"* that Joseph was "engaging in abnormal sexual behavior with minors," that he was "experiencing mental problems and was not in control of his mental state or his actions," and that he was "acting in reckless disregard for the safety of others" and was "engaging in, or wished to engage in acts of sexual misconduct with [Ryan]" is insufficient as a matter of law to show for pleading purposes that the Romeros owed a duty of care to protect Ryan against Joseph's sexual assault. As already discussed, under the *Chaney* duty rule an inference that the defendant possessed prior actual knowledge of the third party offender's criminal propensities is permitted only where the circumstances are such that the defendant *"must have known,"* and not *"should have known,"* of such propensities. (*Chaney, supra,* 39 Cal.App.4th at p. 157, italics added.) Ryan's allegations are thus legally insufficient to the extent they aver that the Romeros "should have known" of Joseph's sexually assaultive propensities.

The record also shows that in the subject summary judgment proceeding, the Romeros met their initial burden of showing that Ryan's claim for negligent supervision had no merit by showing that Ryan was unable to establish that they had *actual knowledge* of Joseph's propensity to inflict violence on female minors, and thus she was unable to show that they owed her a duty to supervise and protect her against Joseph's sexual assault. (See Code Civ. Proc., § 437c, subd. (*o*)(2).)[9] The Romeros presented deposition testimony by their son Elijah and Gail Romero showing that the latter first met Joseph about one year before the April 18, 1999, incident, and during that year Joseph came to the Romeros' home once or twice each month, he spent the night there about eight times, and he attended church with them.

---

[9]Code of Civil Procedure section 437c, subdivision (*o*)(2) provides in part: "(*o*) For purposes of motions for summary judgment and summary adjudication: [¶] . . . [¶] (2) A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto."

Gail Romero's deposition testimony also showed that during the time she knew Joseph before the incident, she never considered him to be dangerous; she knew him to be polite, helpful and likeable; she knew nothing adverse about him other than that he might have had a curfew violation; and to her knowledge Joseph acted appropriately with girls. Based on the foregoing evidence, we conclude the Romeros met their burden of showing they had no actual knowledge before the April 18 incident that Joseph had a propensity to sexually assault female minors or that he posed a threat of physical harm to Ryan if she was left unsupervised for an hour while the Romeros were away from the home buying a pizza for the teenagers.

This issue of whether the court properly denied the Romeros' summary judgment motion on the ground they owed a duty to supervise Ryan and protect her from a sexual assault by Joseph then becomes whether Ryan met her burden of presenting evidence supporting a reasonable inference that the Romeros *must have known* that Joseph had a propensity to sexually assault girls. (*Chaney, supra,* 39 Cal.App.4th at p. 157; see Code Civ. Proc., § 437c, subd. (*o*)(2) [fn. 9, *ante*].) We conclude that Ryan failed to meet her burden. In their separate statement of disputed and undisputed facts in opposition to the Romeros' summary judgment motion, plaintiffs purported to dispute the facts presented by the Romeros. Plaintiffs claimed that *circumstantial* evidence indicated that Gail Romero was "close" to Joseph and was aware of his propensity to sexually molest female minors. Specifically, plaintiffs asserted that by virtue of Gail Romero's experience as a mother, adoptive parent, and foster parent of a total of 23 teenage children, and by virtue of alleged unspecified prior incidents involving teenage boys and girls having sexual relations in her family, she must have known that Ryan and Joseph would be likely to have sexual relations if the Romeros left them unsupervised.

The circumstantial evidence on which plaintiffs relied included (among other things) Joseph's school records showing he had a long history of misconduct, including sexual harassment of female students, fighting and other misbehavior that resulted in numerous detentions and suspensions; as well as evidence that Joseph had been arrested and charged with vandalism. There is no evidence in the record to show that the Romeros knew about this misconduct. We conclude the evidence presented by Ryan was insufficient as a matter of law to show that the Romeros owed her a duty to supervise and protect her from a sexual assault by Joseph during the short period of time the Romeros were away from home buying the pizza. Ryan cites no authority, and we are aware of none, that requires adults to assume that a male teenage invitee will sexually assault a female teenage invitee simply because the adults are away from the house for an hour.

In this regard, the *Chaney* decision is again instructive. There, as the Court of Appeal noted, the plaintiff claimed that the defendant wife of the alleged molester "had 'special and confidential information' about his 'deviant sexual preferences and desires' which she failed to 'recognize, accept and interpret.'" (*Chaney, supra,* 39 Cal.App.4th 152, 158.) The *Chaney* court rejected this claim, as well as the plaintiff's suggestion that a wife must always assume that her husband is likely to molest a child who comes into his home unless the wife diligently supervises the child. (*Ibid.*) The Court of Appeal explained that "[i]t is not enough to allege that the sexual misconduct was *conceivable*. [Citation.] The plaintiff must allege facts showing that it was *foreseeable*, i.e. facts from which it can be inferred that the defendant wife *must have known* that her husband was engaging in, or wished to engage in, acts of sexual misconduct with a minor." (*Ibid.,* original italics.)

Similar reasoning is appropriate here. To impose on an adult a duty to supervise and protect a female teenage invitee against sexual misconduct by a male teenage invitee, it is not enough to assert that is it *conceivable* the latter might engage in sexual misconduct during a brief absence of adult supervision. As we have already held, the imposition of such a duty of care requires evidence of facts from which a trier of fact could reasonably find that the defendant adult had prior actual knowledge of the teenage assailant's propensity to sexually molest other minors.

Here, the record is devoid of any such evidence. Ryan presented no evidence, direct or circumstantial, from which the trier of fact could reasonably conclude that the Romeros must have known of Joseph's history of misconduct at school, his arrests, or his propensity to sexually assault a female minor.[10]

### 4. *No Assumption of Duty*

In opposing the Romeros' summary judgment motion, plaintiffs also contended (as they do on appeal) that Gail Romero assumed a duty to supervise and protect Ryan from a sexual assault by Joseph. Specifically, in their separate statement of undisputed facts plaintiffs presented evidence that when she arrived with Ryan at the Romeros' home, Ryan's mother told Gail Romero, "I do not leave my child anywhere without adult supervision," and

---

[10] As we have recited (*ante*), the undisputed facts in this case show that on April 18, 1999, shortly before Joseph assaulted Ryan, and with express permission that Ryan's mother gave in Gail Romero's presence, Ryan and the other teens present in the Romeros' home, including Joseph, walked to a local drug store *without adult supervision* and returned uneventfully. The undisputed facts also show that prior to the incident, Ryan's mother knew that Joseph was phoning Ryan, she approved of these phone calls, and she met Joseph and thought he was a nice young man.

asked her, "Are you going to be home?" Plaintiffs also presented evidence that Gail Romero replied that she and her husband would be home gardening in the backyard. On appeal, Ryan contends this evidence shows that Gail Romero "assumed the duty to supervise."

The California Supreme Court has explained that under the common law "Good Samaritan" rule, "one 'who, having no initial duty to do so, undertakes to come to the aid of another—the "good Samaritan" '—has 'a duty to exercise due care in performance and is liable if (a) his failure to exercise care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.' [Citations.]" (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 613 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; see also BAJI No. 4.45 ["A person who is under no duty to care for or render service to another but who voluntarily assumes such a duty, is liable to the other for injury caused by a failure to exercise ordinary or reasonable care in the performance of that assumed duty"].)

Here, we conclude that Ryan failed to show there is a triable issue of material fact whether the Romeros assumed or undertook a duty, as good Samaritans, to stay home all afternoon and supervise Ryan to protect her from a sexual assault by Joseph. Plaintiffs' evidence supports only a reasonable inference that Gail Romero gave an assurance that she and her husband had no plans for the afternoon other than to be in the backyard gardening. The undisputed facts show that Ryan and her mother knew and agreed that the Romeros would not personally supervise Ryan at all times during Ryan's visit. As already discussed, it is undisputed that on the day of the incident Ryan's mother gave express permission for Ryan and Joseph to walk with the other youngsters from the Romeros' home to a local drug store *without any adult supervision.*

In sum, to the extent plaintiffs allege the Romeros are liable for negligent supervision under a theory of *nonfeasance* for negligently failing to properly supervise Ryan and control the conduct of her teenage assailant Joseph, we hold under the applicable *Chaney* duty rule that the Romeros owed Ryan no duty of care, and that Ryan failed to show there is a triable issue of material fact whether the Romeros undertook a duty of care for purposes of the "Good Samaritan" rule.

### C. *No Duty Under Misfeasance/General Negligence Principles*

Ryan's factual allegations in her operative amended complaint also show that she was seeking to hold the Romeros liable in tort for negligent supervision based upon a theory of *misfeasance.* Specifically, she alleged in

paragraph 36 of her amended pleading that on the date in question, the Romeros invited her into their home after they "represented to plaintiffs that their home was safe . . . ." She also alleged in paragraph 38 that the Romeros knew at that time that Joseph was "engaging in abnormal sexual behavior with minors." These allegations indicate that Ryan was claiming the Romeros did not merely fail to prevent Joseph from harming her, but that by their own acts they increased the risk that such harm would occur.

As already discussed, "[m]isfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk." (*Weirum, supra,* 15 Cal.3d at p. 49.) "[Where] the act complained of is one of *misfeasance*, the question of duty is governed by the *standards of ordinary care* . . . ." (*Ibid.,* italics added.)

 The California Supreme Court has explained that a legal duty is an expression of the sum total of those considerations of policy that lead the law to conclude that a particular plaintiff is entitled to protection. (*Parsons, supra,* 15 Cal.4th at p. 472.) The high court's landmark 1968 decision in *Rowland, supra,* 69 Cal.2d 108, "has stood as the gold standard against which the imposition of common law tort liability in California is weighed by the courts in this state." (*Juarez, supra,* 81 Cal.App.4th at p. 401.) Since the publication of the *Rowland* decision, its many judicial progeny have adopted the *Rowland* court's policy-driven, multifactor weighing process for determining whether in a particular case a defendant owed a tort duty to a given plaintiff. (See *Juarez, supra,* 81 Cal.App.4th at p. 401.) These nonexclusive factors (the *Rowland* factors) generally include: (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; (7) the consequences to the community of imposing a duty to exercise care with resulting potential liability for breach of that duty; and (8) the availability, cost, and prevalence of insurance for the risk involved.[11] (*Parsons, supra,* 15 Cal.4th at pp. 472-473, citing *Rowland, supra,* 69 Cal.2d at p. 113.)

Our high state court has explained that a court's task in determining "duty" by applying the *Rowland* factors is to generally evaluate "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6 [224

---

[11]Because neither of the parties has addressed the last *Rowland* factor, we shall not consider it in deciding the duty issue presented here.

Cal.Rptr. 664, 715 P.2d 624].) We proceed to the task of applying the *Rowland* factors to the record below to determine whether, and the extent to which, the Romeros owed a duty of care to Ryan under principles of ordinary negligence.

### 1. *Foreseeability of Harm*

■ The first *Rowland* factor we must examine is the critical element of foreseeability of harm to the plaintiff. (*Rowland, supra,* 69 Cal.2d at p. 113.) "If injury to another ' "is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct" ' [citations], we must label the injury 'reasonably foreseeable' and go on to balance the other *Rowland* considerations." (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 307 [34 Cal.Rptr.2d 498].)

■ Here, Ryan has presented no evidence to support a reasonable inference that the Romeros were aware of any facts sufficient to put a reasonable person on notice that Joseph had a long history of misconduct at school that resulted in numerous detentions and suspensions, that he had been arrested and charged with vandalism, or that he posed a threat of sexual assault to Ryan if left unsupervised. The record is devoid of any evidence showing that such risk of harm was reasonably foreseeable in this matter.

### 2. *Degree of Certainty That Plaintiff Suffered Harm*

None of the parties dispute that Ryan suffered injury when Joseph sexually assaulted her in the Romeros' home.

### 3. *Closeness of Connection Between the Romeros' Conduct and Ryan's Injury*

Ryan contends that the injury she suffered would not have occurred "[i]f [Gail Romero] had not broken her promise to [Ryan's mother] to remain at the residence and had not breached her duty to supervise the teenagers . . . ." We conclude there is only a tenuous connection between the Romeros' conduct and Ryan's injury. As we have already discussed, the evidence that Ryan and her mother presented in opposition to the Romeros' summary judgment motion supported only a reasonable inference that Gail Romero gave an assurance that she and her husband had no plans for the afternoon other than to be in the backyard gardening. Plaintiffs presented no evidence that the Romeros promised they would be physically present in the home and would personally supervise Ryan at all times during Ryan's visit. To the contrary, as we have already noted, the undisputed facts show that on

the day of the incident Ryan's mother gave express permission allowing Ryan to walk with Joseph and the other youngsters, without any adult supervision, from the Romeros' home to a local drugstore. It is undisputed that the teens did walk to the drugstore unsupervised, and that they returned to the Romeros' home without incident.

### 4. *Moral Blame Attached to the Romeros' Conduct*

No evidence was adduced during the summary judgment proceeding in this matter to show that the Romeros engaged in any morally blameworthy conduct. On the contrary, the undisputed facts show that Gail Romero acted appropriately at all relevant times. Uncontradicted evidence shows that she supervised the teens prior to the assault by interrupting her gardening and entering the house several times to see what they were doing. She testified during her deposition that she felt she needed to care for Ryan while she was in their home, but she felt Ryan was safe with the other teens who were there. It is undisputed that about 4:30 p.m. the Romeros left for about an hour to buy the teens a pizza. During this brief period of time, Joseph sexually assaulted Ryan inside a bedroom in the Romeros' home. It is undisputed that other teenagers were present in the home when the assault occurred. Because we have concluded the risk that Joseph would commit such a sexual assault while temporarily unsupervised was not reasonably foreseeable, we conclude that the Romeros' act of leaving their home for an hour for the purpose of bringing pizza to the youngsters was not morally blameworthy.

### 5. *Policy of Preventing Future Harm*

We agree with the *Juarez* court's statement that "[o]ur greatest responsibility as members of a civilized society is our common goal of safeguarding our children, our chief legacy, so they may grow to their full potential and can, in time, take our places in the community at large." (*Juarez, supra*, 81 Cal.App.4th at p. 407.) Sexual assaults against minors, whether perpetrated by adults or other minors, gravely threaten the achievement of this most important objective of every civilized society. For this reason, public policy against the victimization of minors is codified in California's criminal statutes, which impose severe penal consequences on those who commit such acts. (See, e.g., Pen. Code, §§ 288, subd. (a), 288.5, subd. (a) & 1203.066, subd. (a).)

Imposition of tort liability under civil law can also promote the policy of preventing future harm to minors by imposing pecuniary consequences in appropriate cases on tortfeasors who assault minors, or who through acts of

nonfeasance fail to take reasonable action to protect them from harm when the law requires such action, or who through acts of misfeasance unreasonably increase the risk that minors will be sexually assaulted. The policy of preventing future harm is not well served, however, by imposition of a legal duty in circumstances where, as here, the risk of harm to a teenager is not reasonably foreseeable.

### 6. *Extent of the Burden to the Romeros*

Applying the *Rowland* factor that assesses the extent of the burden to the defendants, Ryan argues that either Gail Romero or her husband could have stayed home to supervise the minors while the other went out to buy the pizza for the teens or, in the alternative, the Romeros could have attempted to contact Ryan's mother by telephone to inform her they were going out for an hour to buy pizza for the youngsters and she needed to pick up her daughter if she did not want her to remain unsupervised. However, in light of the undisputed fact that the mother had already given Ryan permission to walk to the drugstore with Joseph without adult supervision, it appears unlikely she would have picked up Ryan had the Romeros informed her they were planning to leave Ryan unsupervised for an hour. Moreover, while we believe that some adults in the Romeros' situation might decide that one parent could stay at home to supervise, or might contact the teenage invitee's parents or caretakers, this fact does not equate to a duty of care to protect the invitee against a reasonably unforeseeable sexual assault by another teenage invitee while they are in the defendants' home. The imposition of such a duty would place the parents in the untenable position of either excluding any group of teens from their home or making sure that at least one parent is physically present in close proximity to the teens at all times. We conclude that this burden, in the absence of any knowledge on the part of the parents of a risk of particular harm associated with an individual invitee, militates against imposition of a duty of care.

### 7. *Consequences to the Community of Imposing a Duty to Exercise Care with Resulting Potential Liability for Breach of That Duty*

The consequences to the community of imposing a duty to provide continuous supervision of teenage invitees, accompanied by the potential for ruinous tort liability for monetary damages for breach of that duty under circumstances in which the risk that one teenager may sexually assault another is not reasonably foreseeable, would be serious and detrimental. Parents aware of such potential for being sued for negligent supervision would hesitate to invite into their home other minors, friends of their children, and even a teenager they have known for a long time, whom they

have reason to trust, and who to their knowledge has exhibited no behavior that would cause a reasonably prudent person to suspect the minor poses a threat of physical harm to another minor invitee. A cloud of suspicion would hang over all youngsters invited into the home and would deter social interaction among minors in a family environment that is typically among the safest: the home. The imposition of such a duty would lead to the further result of encouraging minors who are unable to socialize with young friends in a home environment to socially interact elsewhere where adult supervision may not be as thorough and protective.

### 8. *Balancing and Holding*

In sum, we conclude under the facts of the instant case that petitioners did not owe Ryan a duty of care under a theory of misfeasance and general negligence principles to control Joseph, warn Ryan, or take any other affirmative action to prevent Joseph from sexually assaulting her. Consideration of the relevant *Rowland* factors militates against imposition of such a duty on the Romeros. Because the record in this matter is devoid of any evidence showing that petitioners were aware of facts sufficient to put a reasonable and prudent adult on notice that Joseph had previously engaged in assaultive behavior or posed a threat of physical harm to Ryan or the other teens in petitioners' home, we conclude as a matter of law that they owed no duty of care under principles of ordinary negligence to supervise these two teenagers during the entire time they were in the petitioners' home.

We note in closing that the *Pamela L.* case on which Ryan relies, is factually distinguishable. In that case three minor girls brought suit for assault and battery and negligence against a husband and his wife, alleging that the husband sexually molested them at his home, and that his wife, who allegedly knew of her husband's history of child molestation, negligently encouraged and invited the girls to use the swimming pool at her house while she was at work and her husband was at home. (*Pamela L.*, *supra*, 112 Cal.App.3d 206, 207-208.) Specifically, the plaintiff minors alleged in their complaint that the wife had actual knowledge that her husband had a record as a sexual offender who had molested women and children in the past, and she nonetheless negligently invited the minors to play in her swimming pool at her home when she knew the girls would be alone with her husband. (*Id.* at pp. 208-209.) The minors also alleged that the wife negligently encouraged the girls' parents to permit them to go onto the premises by telling the parents it was perfectly safe to permit the girls to swim when she was not there because her husband would be there. (*Id.* at p. 209.) Concluding that the plaintiffs' allegations, if true, were sufficient to show that the defendant wife, by her own acts of enticing the children to come to her home with

knowledge that her husband had molested children in the past, knowingly increased the risk of harm, the Court of Appeal in *Pamela L.* reversed the judgment of dismissal entered in favor of the defendant wife after the trial court sustained her demurrer without leave to amend. (*Pamela L., supra*, 112 Cal.App.3d at p. 212.)

Here, unlike in *Pamela L.*, there is no evidence to show that the Romeros were aware of any facts sufficient to put a reasonable person on notice that Joseph had a propensity to molest female minors or had engaged in assaultive behavior at school.

Petitioners are thus entitled to summary judgment. Accordingly, we grant the petition.

## DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order denying the Romeros' motion for summary judgment, enter a new order granting the motion, and enter a judgment of dismissal in their favor. The temporary stay imposed on October 31, 2000, will vacate upon issuance of the remittitur. Petitioners shall recover costs incurred in this writ proceeding.

Huffman, Acting P. J., and McDonald, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied September 26, 2001.