[No. A110054. First Dist., Div. Two. May 5, 2006.]

MARGARET W., Plaintiff and Appellant, v.
KELLEY R., Defendant and Respondent.

## Counsel

Law Offices of J. Frank George, J. Frank George; Law Office of Daniel U. Smith and Daniel Upham Smith for Plaintiff and Appellant.

McNamara, Dodge, Ney, Beatty, Slattery, Pfalzer & Borges, Seth J. Schwartz and Gary A. Watt for Defendant and Respondent.

**OPINION**

**BUSCH, J.**[*]—

## INTRODUCTION

The night of December 12, 1998, devolved into tragedy for appellant Margaret W. Appellant, who was then 15 years old and a high school sophomore, went to a sleepover at a friend's house and drank too much. Without permission from either her parents or the host parent, she left the house in the company of a girlfriend and some boys from school to hang out at the house of one of the boys, where she alleges she was brutally raped by the boys.[1] Several people's lapses of judgment, failures to communicate, and criminal conduct contributed to the horrible events of that night. The issue is not whether plaintiff was the victim of a terrible wrong nor whether she suffered devastating injury as a result of that wrong, but instead who is liable under our tort law for her injuries.[2] Appellant has sued the boys she alleges raped her, the parents of the boy at whose house she was raped, and respondent Kelley R., the mother of appellant's sleepover host. The trial court granted summary judgment in favor of respondent, concluding that she did not owe appellant a duty to prevent the criminal conduct that occurred under the circumstances of this case, and appellant challenges that ruling on appeal. The potential liability of the other defendants is not at issue. We affirm.

## I. STATEMENT OF FACTS

Respondent planned to go to dinner with friends and then to a small Christmas party on the evening of December 12, 1998. She did not want to leave her 15-year-old daughter Brianna R. home alone, so Brianna invited friends to join her during the evening and sleep over at respondent's home. With respondent's permission and approval, Brianna made plans with appellant and at least one other girl, Lauren M., for the sleepover. Respondent's younger daughter, J.R., had plans to be at a friend's home.

Appellant had slept over at respondent's home on many prior occasions. Appellant's mother assumed that a host parent could be away for several

---

[*] Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The parties have not submitted any evidence concerning the assault itself in connection with these proceedings. Instead, appellant does not dispute respondent's first fact in the separate statement of facts that the "lawsuit arises out of the alleged rape of [appellant]" by the three boys. The separate statement refers for support only to the complaint. Therefore, we, like the parties, will assume the alleged facts of the rape for purposes of this appeal. Because we do not know if these facts are in dispute, anything we say about them is not intended to adjudicate any factual contests that may still exist at the trial level.

[2] The record reveals that respondent believes the boys have been convicted of crimes arising out of their conduct.

hours so long as the children would not be left unsupervised overnight. Appellant's mother did not talk directly to respondent about respondent's plans for this evening or about the rules that respondent would impose. Respondent did, however, tell Brianna to make sure that her guests and their parents knew she would be out during the evening.

Respondent took various steps to avoid problems during the evening. She left her liquor cabinet locked.[3] She left the phone number where she could be reached. She also gave the girls express rules to govern their conduct. She wanted to talk to all the girls about the rules, but appellant had not arrived by the time respondent had to leave. Therefore, respondent told Brianna and Lauren that they could not have a party, could not have boys or other girls come over, could not drink any alcohol, and could not leave the house. Both girls agreed to follow those rules and told respondent that they could be trusted to do so. With these steps taken, respondent left her house about 6:30 p.m.

Alexis D. arrived after respondent left.[4] Alexis invited some boys to come over, and the boys brought alcohol. Brianna and Lauren began drinking before appellant arrived.

Appellant, whose parents were divorced, was at a family dinner with at least her older sister, her father, and her stepmother. During the dinner, appellant learned that her father and stepmother were going to have a baby. Appellant was upset by this news. After dinner, appellant's sister drove her to respondent's house, where she arrived after 9:00 p.m. Appellant began drinking heavily to "catch up" with her friends. She drank five to 10 shots of hard liquor over the course of about an hour. At least two of the eventual assailants, Josh T. and Vince U., arrived at the R.'s house. The record is conflicting whether the third boy, Brian W., was at the R.'s house or only at Josh's house. Josh was a senior at appellant's high school. Appellant knew him and was attracted to him before that night.

---

[3] Earlier that year, Brianna hosted a Valentine's Day party for 20 to 25 girls and boys without respondent's permission while respondent was out and while Brianna was supposed to be spending the night at a friend's house. Guests, including appellant, drank respondent's liquor. Respondent returned home and broke up the party. One boy and one girl, neither of whom were involved in the events of December 12, were in a bed in a bedroom with the door closed, although there is no evidence that they were unclothed or engaged in any sexual conduct (which makes appellant's repeated description of the event as "statutory rape" or "having sex" unfounded and misleading). Respondent demanded that those who had been drinking leave their car keys with her, and she agreed to take care of appellant, who had become very intoxicated and whose mother was in the hospital. Subsequently, she punished Brianna and put a lock on her liquor cabinet, which remained locked at all times thereafter.

[4] The record is unclear whether Alexis was an invited guest for the sleepover or came with the other teens after respondent had left for the evening.

About 10:00 p.m. respondent called home to make sure nothing was wrong. J.R., who had come back to get some clothes, answered the phone and told respondent that things were fine. J.R. did not tell respondent anything about the presence in the house of boys, extra girls, or alcohol. Respondent told J.R. where she could be reached and that she expected to return about 11:30 p.m.

Sometime after respondent's phone call, but before 11:00 p.m., Brianna passed out from too much alcohol. Alexis tried to take care of Brianna. While Alexis was beginning to deal with Brianna, appellant and Lauren told Alexis they were going to leave the house with the boys. Alexis, who needed help with Brianna, begged them not to leave, but they left anyway, telling Alexis that Brianna was not their problem. The girls did not tell Alexis where they were going to go. They left the R.'s house and went to Josh's house voluntarily. Appellant and Lauren were glad to be with the boys; they were having fun hanging out with Josh, Vince, and Brian; and they did not feel they were in danger or that they were physically or sexually threatened. At least the boys continued drinking.[5]

Alexis, increasingly concerned about Brianna's condition and about the other girls getting in trouble for leaving, paged appellant several times. Sometime between 11:00 p.m. and 11:30 p.m., not having heard back from appellant, Alexis called respondent at the Christmas party. Alexis told respondent that Brianna had been drinking and had passed out and was not moving, and respondent said she would come straight home. Ten minutes later, respondent arrived home to find appellant and Lauren gone. Alexis told respondent that appellant and Lauren had left "to party with a bunch of people." The record is not clear whether Alexis told respondent that Josh, Vince, and Brian were part of that bunch of people with whom plaintiff had left, but it is undisputed that respondent had never heard of any of the assailants and knew nothing about them until sometime after December 12. Moreover, there is no evidence that respondent was told that appellant and Lauren were alone with three boys or that they were at the house of one of those boys. Understandably, respondent turned her attention to caring for her daughter and getting her safely to bed.

About midnight, appellant, with Lauren next to her, returned the pages Alexis had left. Alexis answered the phone in Brianna's bedroom or in the hallway outside Brianna's room, where respondent was tending to Brianna. Appellant did not speak directly to respondent during this call. Appellant was not upset, and the girls were not uncomfortable when the call began. At that time, neither she nor Lauren felt physically or sexually threatened, and

---

[5] The record does not reflect what, if anything, the girls had to drink at Josh's house, although they may have joined the boys in playing drinking games.

appellant did not communicate anything to Alexis that would suggest any such threat to their safety. Alexis tried to convince appellant that, if she stayed at Josh's house, her parents would find out and she would get in trouble. Appellant, now feeling "stuck and uncomfortable" because the boys were not going to be able to take her home, asked if she could return to respondent's house. Alexis told respondent that appellant and Lauren wanted to know if they could come back. Respondent, upset that the girls had broken their promise and had abandoned her daughter, preoccupied with caring for her daughter, and no longer needing the girls to provide company for her daughter, told Alexis to tell them that they could not come back and that they should instead go home. Appellant could hear respondent in the background and understood that respondent was upset with her. Appellant asked Alexis if she could speak with respondent, but was told she could not. By the conclusion of this phone call, appellant was crying and hysterical because she was drunk, knew she should not be where she was, and felt stuck.[6] She did not, however, tell Alexis, and no one told respondent, that appellant felt physically or sexually threatened or that she had no way to get home or no one else to call for help. In fact, had she called her mother, her father, her sister, or her brother, whose phone numbers she knew, they would have come to get her.[7] She chose not to do so because she did not want them to know she was drunk.[8]

Instead, the girls stayed at Josh's house. Appellant alleges that during the night the boys brutally sexually assaulted her, and that she was physically and emotionally injured by the assault.

---

[6] Lauren, who was with appellant when she made this phone call, stated in one declaration that appellant "was by this time so out of it and emotional that she could not take care of herself." Two days later she signed a "supplemental" declaration stating, "When [appellant] got off the phone, I do not believe that she was so intoxicated that she was unable to care for herself." Lauren never stated that she herself could not take care of herself, and she did state, "On the night of the incident, [appellant] and I knew that we could call our parents if we wanted to, but chose not to."

[7] Indeed, appellant's mother had made it "very clear" to appellant that "if there's someone drinking you're not comfortable around or if you are, you have no fear of calling me." If appellant had called, she "absolutely" would have come and picked her up.

[8] Likewise Lauren knew that she could call her parents, but chose not to do so. The record does not reflect whether Lauren's parents were available to pick up the girls. Nor does the record reflect where Lauren was during the attack on appellant or whether anything happened to Lauren during the night.

## II.  PROCEDURAL HISTORY

The operative complaint against respondent states causes of action for negligence, negligent supervision, and negligent infliction of emotional distress.[9] Respondent moved for summary judgment on the ground that she owed no actionable duty to appellant. With her reply papers, respondent objected to (1) appellant's evidence supporting allegations based on appellant's intoxication or respondent's providing alcohol to appellant, arguing that respondent cannot be liable for any such conduct by virtue of Civil Code section 1714, subdivisions (b) and (c) (providing immunity to "social host" for injuries resulting from alcohol consumption and stating that consumption, not the furnishing, of alcohol is the proximate cause of such injuries); (2) appellant's reliance on purported admissions by respondent with respect to any duty she may owe appellant; and (3) appellant's use of nonparty hearsay statements from the police incident report. On December 21, 2004, the trial court entered its order sustaining the second and third evidentiary objections, ruling on the first objection that evidence of appellant's intoxication could be used only to demonstrate knowledge of danger, and granting the motion for summary judgment.[10]

On the basis of the court's sustaining the objection to evidence in the police report, appellant took the depositions of Alexis and the police officer who had conducted the interviews included in the police report. The court considered this additional evidence in passing on appellant's motion for reconsideration of the order granting summary judgment. The court heard oral argument on the motion for reconsideration March 4, 2005, and denied that motion. Final judgment was entered April 11, 2005, and this appeal followed.

## III.  ANALYSIS

### A.  *Standard of Review*

"Under the summary judgment statute, Code of Civil Procedure section 437c, the defendant meets its burden of showing that a cause of action has no

---

[9] Respondent's demurrer was sustained with respect to appellant's claim for intentional infliction of emotional distress.

[10] As appellant recognized below, the evidentiary objections that the court sustained were broad. In particular, the second objection removes "from consideration all the statements by [respondent] about what was going on that night" "in terms of what [she] thought her obligation to be to [appellant]." Likewise, the court broadly excluded the hearsay statements of nonparties that were included in the police report. Appellant has not sought review of the evidentiary rulings. Accordingly, we will not consider evidence excluded by those rulings. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65–66 [99 Cal.Rptr.2d 316, 5 P.3d 874].) To the extent such evidence and arguments are included in appellant's briefs, we will disregard them.

merit if it shows 'that one or more elements of the cause of action, . . . cannot be established, or that there is a complete defense to that cause of action. *Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . .* to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. *The plaintiff . . .* may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, *shall set forth the specific facts showing that a triable issue of material fact exists* as to that cause of action or a defense thereto.' (Code Civil Proc., § 437c, subd. (o)(2), italics added.) 'We review the trial court's ruling on respondent's motion for summary judgment under the independent review standard. An appellate court must independently determine the construction and effect of the facts presented to the trial judge as a matter of law. [Citations.]' [Citation.]" (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 392–393 [97 Cal.Rptr.2d 12] (*Juarez*) [§ 437c, subd. (o) was redesignated as subd. (p) in 2002].) We construe the evidence offered by the party opposing the motion liberally, and the moving party's evidence strictly. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) In short, we review the issue de novo applying the statutory standards applicable to a motion for summary judgment.

### B. *Liability for the Tort or Crime of Another*

Respondent, of course, did not commit the attack on appellant. Instead, she is accused of negligently failing to take action to prevent the attack or protect appellant. Generally, one has "no duty to act to protect others from the conduct of third parties." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 [30 Cal.Rptr.3d 145, 113 P.3d 1159] (*Delgado*).) That reflects the law's reluctance to impose liability for nonfeasance. (*Id.* at p. 235, fn. 12.) "A person who has not created a peril is ordinarily not liable in tort merely for failure to take affirmative action to assist or protect another, no matter how great the danger in which the other is placed, or how easily he or she could be rescued, unless there is some relationship between them that gives rise to a duty to act." (6 Witkin, Summary of Cal. Law (10th ed. 2005), Torts, § 1038, pp. 332–333.)

If there is no duty, there can be no liability, no matter how easily one may have been able to prevent injury to another. And, while questions concerning whether a duty has been breached and whether that breach caused a plaintiff's injury may be questions of fact for a jury, the existence of the duty in the first place is a question of law for the court. (*Delgado, supra,* 36 Cal.4th at p. 237.) The existence and scope of any duty, in turn, depends on the foreseeability of the harm, which, in that context, is also a legal issue for the court. (*Ibid.*)

### 1. *The Parties' Contentions and the Ruling Below*

Respondent, relying principally on *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 [107 Cal.Rptr.2d 801] (*Romero*), argued that as a matter of law the rape of appellant was not foreseeable unless respondent had prior actual knowledge of the assailants' propensity to commit sexual assaults. Because there was no evidence that respondent even knew these boys, let alone anything to suggest they had such a propensity, respondent argued that appellant could not establish a necessary element of her case. Appellant responded, seeking to distinguish *Romero* on its facts and arguing that appellant did not need to prove that high level of foreseeability because respondent had voluntarily undertaken to protect appellant. The trial court, noting "that the real focus is on the *Romero* case," concluded, "The admissible evidence demonstrates quite clearly that [respondent] had no knowledge whosoever [*sic*] that [appellant] was in any danger nor that the 'boys' had any propensity for sexual aggressiveness. [Respondent] clearly meets her burden on that issue and [appellant's] evidence fails to demonstrate a triable material issue."

On appeal, appellant relies on two distinct relationships as a basis for assigning liability to respondent for failing to act to prevent the injuries appellant suffered at the hands of her attackers. First, she argues that respondent had a special relationship with appellant arising out of appellant being an invitee in respondent's home. And she argues that foreseeability should be measured not by *Romero*'s requirement of actual knowledge of a propensity to assault, but by the "sliding scale" explained in *Delgado*: "In circumstances in which the burden of preventing future harm caused by third party criminal conduct is great or onerous . . . heightened foreseeability—shown by prior similar criminal incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location—will be required. By contrast, in cases in which harm can be prevented by simple means or by imposing merely minimal burdens, only 'regular' reasonable foreseeability as opposed to heightened foreseeability is required." (*Delgado*, *supra*, 36 Cal.4th at pp. 243–244, fn. 24.)[11] Second, she argues that respondent voluntarily undertook to protect appellant and can, therefore, be liable for failing to exercise due care in performing that undertaking. (*Delgado*, at p. 249.) We will discuss each theory in turn.

---

[11] Although *Delgado, supra,* 36 Cal.4th 224, was decided after the trial court decision, it derived this rule from *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207]. Appellant, however, is free to rely on any theory that would support liability, even if it was not fully developed below. (*Juarez, supra,* 81 Cal.App.4th at p. 397.)

## 2. *Special Relationship Liability*[12]

■ In some circumstances, it can be difficult to determine whether the parties are in a special relationship. Here, however, the issue is not the formation of such a relationship, but what duties arise from the fact that such a relationship was created on appellant's arrival at the R.'s home. Respondent concedes, as she must, that a host parent assumes a special relationship with children invited into her home. (*Chaney v. Superior Court* (1995) 39 Cal.App.4th 152, 157–158 [46 Cal.Rptr.2d 73].) Society's "greatest responsibility . . . is our common goal of safeguarding our children," and, to that end, it is appropriate that our civil laws reflect the abhorrence of sexual violence against minors that is embodied in our criminal laws. (*Juarez, supra,* 81 Cal.App.4th at p. 407.) The existence of a special relationship, however, is only the beginning of the analysis. (*Romero, supra,* 89 Cal.App.4th at p. 1080; *Chaney v. Superior Court, supra,* 39 Cal.App.4th at pp. 157–158.) In order for there to be a duty to prevent third party criminal conduct, that conduct must be foreseeable. (*Delgado, supra,* 36 Cal.4th at p. 244; *Romero, supra,* 89 Cal.App.4th at p. 1081.)

As the trial court recognized, *Romero* is the case with the most closely analogous facts. In that case, as here, the plaintiff, a teenage girl, was invited into the defendants' home, was raped, and sued the defendants for "negligent supervision." The plaintiff, a 13-year-old girl, and her 16-year-old boyfriend were invited to spend the afternoon in the defendants' home with the defendants' son, a friend of the boyfriend. The plaintiff's mother liked the boyfriend and approved of their relationship. When the plaintiff's mother dropped her off, she spoke with one of the defendants for 20 minutes. Although it was important to her that there be adult supervision, the mother understood and thought it was alright that the defendants would be in the backyard while the children were in the house and that the children would walk by themselves to a drugstore. (*Romero, supra,* 89 Cal.App.4th at pp. 1072–1074.) The defendants in fact monitored the children, checking on them from time to time, and the children in fact went to the drugstore without supervision. Later in the afternoon, the defendants left the house to get a pizza for the children, intending to be gone about an hour. While they were away, the boyfriend took the plaintiff into a bedroom and raped her.

The court was called upon to decide a question very similar, though not identical, to the question presented in this case. "We are thus called upon to

---

[12] This division has debated the role of a "special relationship" in analyzing duty for purposes of imposing liability in tort. (See *Juarez, supra,* 81 Cal.App.4th at pp. 410–411 & fn. 10.) In *Delgado, supra,* 36 Cal.4th 224, and its companion case, *Morris v. De La Torre* (2005) 36 Cal.4th 260 [30 Cal.Rptr.3d 173, 113 P.3d 1182] (*Morris*), the Supreme Court has made it clear that the concept of "special relationship" remains a very important analytic tool in determining duty.

determine the scope of the duty of care that adults owe to teenagers they invite into their homes to supervise and protect them against assaults by other teenage invitees during their visits."[13] (*Romero, supra,* 89 Cal.App.4th at p. 1078.) The court held that an adult who invites a minor into her home assumes a special relationship with the minor in light of the minor's vulnerability. (*Id.* at pp. 1080–1081.) But, despite that special relationship, the existence of a duty still requires that the harm be reasonably foreseeable, which requires that the defendant have actual knowledge of the assaultive propensities of the assailant. (*Id.* at p. 1081.) Defendants cannot be liable under a negligent supervision theory for nonfeasance based solely on constructive knowledge or information they should have known.[14] (*Id.* at pp. 1083, 1088–1089.) There is no per se rule of duty to every invitee, and there must be actual knowledge in addition to a special relationship. (*Id.* at p. 1084.) "To impose on an adult a duty to supervise and protect a female teenage invitee against sexual misconduct by a male teenage invitee, it is not enough to assert that [it is] *conceivable* the latter might engage in sexual misconduct during a brief absence of adult supervision. As we have already held, the imposition of such a duty of care requires evidence of facts from which a trier of fact could reasonably find that the defendant adult had prior actual knowledge of the teenage assailant's propensity to sexually molest other minors." (*Id.* at p. 1089.) Because there was no evidence of such actual knowledge, the defendants' writ of mandate was granted with an order that the trial court vacate its order denying the defendants' motion for summary judgment and enter judgment for the defendants.

As *Romero* recognized (*Romero, supra,* 89 Cal.App.4th at pp. 1084–1086), its result is fully consistent with our decision affirming a grant of summary judgment on a claim for negligent supervision in *Juarez*. In *Juarez*, the plaintiff was the victim of repeated sexual abuse at the hands of an adult scoutmaster during various scouting events. We affirmed a grant of summary judgment as to the claim for negligent supervision because the scouts knew nothing about the scoutmaster that could be deemed a specific warning that he posed an unreasonable risk to minors.[15] (*Juarez, supra,* 81 Cal.App.4th at p. 397.)

---

[13] Here the assault did not occur in respondent's home or during the visit, and the attacker was not an invitee.

[14] The boyfriend in fact had some troubling history, but that history was irrelevant since it was not known to defendants. (See *Romero, supra,* 89 Cal.App.4th at pp. 1088, 1089, fn. 10.)

[15] The one theory on which we reversed the grant of summary judgment in *Juarez* was the distinct claim—not present here—that the scouts breached a duty to take reasonable protective measures when they undertook to teach, secure, and oversee the troop, in part through education on understanding and avoiding sexual attacks. Though the scouts undertook to provide these educational materials, which the evidence showed were effective preventative measures, to all members, they only gave the plaintiff's troop materials in English. Therefore,

Arguably, the Supreme Court reinforced these holdings of *Romero* and *Juarez* in *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138 [12 Cal.Rptr.3d 615, 88 P.3d 517] (*Wiener*). In that case, two children were killed and the plaintiffs and others were seriously wounded when a man named Abrams rammed his car through a chain link fence into the defendant's schoolyard. Abrams was convicted of first degree murder among other crimes. The complaint alleged the fence was inadequate to protect children playing near a busy roadway. Although there had been no prior criminal intrusions, a mail truck had accidentally gone through the fence some years earlier when the property was occupied by a different tenant, and there had been other traffic accidents near the property. The Court of Appeal reversed a grant of summary judgment in favor of the defendant on the theory that a motorist crashing through the fence was sufficiently foreseeable to require the defendant to build a stronger fence, which, in turn, would have prevented the accident. The Supreme Court reversed.

■ The Supreme Court recognized a landlord's duty to protect children from foreseeable perils. (*Wiener, supra,* 32 Cal.4th at p. 1145.) And the court acknowledged: "In the case of a criminal assault, *Ann M.[, supra,* 6 Cal.4th 666, 25 Cal.Rptr.2d 137, 863 P.2d 207] held that the decision to impose a duty of care to protect against criminal assaults requires 'balancing the foreseeability of the harm against the burden of the duty to be imposed.' " (*Id.* at pp. 1146–1147.) The lesser the burden of preventing harm, the lesser the required degree of foreseeability. (*Id.* at p. 1147.) But the court emphasized that the focus needed to be on the foreseeability of the particular criminal act itself, not the general nature of the harm that resulted. (*Id.* at p. 1148.) "[C]ases analyze third party criminal acts differently from ordinary negligence, and require us to apply a heightened sense of foreseeability before we can hold a defendant liable for the criminal acts of third parties. [Citation.] There are two reasons for this: first, it is difficult if not impossible in today's society to predict when a criminal might strike. Also, if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal." (*Id.* at pp. 1149–1150.) The court, therefore, concluded that, because Abrams's criminal conduct was impossible to anticipate and because the defendant had never been the target of violence in the past, the "defendants owed no duty to plaintiffs because Abrams's brutal criminal act was unforeseeable." (*Id.* at p. 1150.)[16]

---

they negligently failed to disseminate their educational materials to the plaintiff's Spanish-speaking troop in Spanish, even though the materials were available in Spanish. (See *Juarez, supra,* 81 Cal.App.4th at pp. 398–406.) That portion of *Juarez* is not directly relevant to this case.

[16] The court, however, in dictum, held out the possibility that "some types of crime might be foreseeable without prior similar incidents, so that a simple security measure might deter a

The next year, on June 30, 2005, the Supreme Court decided *Delgado* and *Morris*, a pair of premises liability cases in each of which the plaintiff was the victim of a criminal assault on the defendant's business property, and in each of which the Supreme Court started from the proposition that the defendant had a special relationship with the plaintiff as its invited customer.[17] In *Delgado, supra*, 36 Cal.4th 224 the plaintiff and his assailant were staring aggressively at each other inside the defendant's bar. The defendant's bouncer noticed what was happening, recognized the potential for trouble, and asked the plaintiff to leave. The plaintiff went out to the parking lot. The assailant and some companions followed him out of the bar into the parking area, where they were joined by 12 to 20 friends, all of whom participated in beating the plaintiff.

The plaintiff's theory was that having hired a security guard and having noticed impending trouble, the assault was necessarily foreseeable, and the defendant was negligent in not having sufficient security to protect the plaintiff. The court recognized that a business has a special relationship with its patrons that requires it to take reasonable steps to secure common areas against third party crime likely to occur absent such steps being taken (*Delgado, supra*, 36 Cal.4th at p. 235) and that it is necessary to balance the degree of foreseeability against the burden of preventing harm and the policy reasons for preventing the harm (*id.* at pp. 237–238). Steps as burdensome as hiring a security guard would be required only if there were "heightened foreseeability"—i.e., knowledge of the perpetrator's propensity to assault or knowledge of prior similar incidents in that location. (*Id.* at p. 240.) But the proprietor could still owe some "other special-relationship-based duty to plaintiff, such as . . . undertaking reasonable, relatively simple and minimally burdensome measures," to respond to events unfolding in its presence. (*Id.* at p. 245, italics omitted.) Because the defendant had actual notice of an impending assault, it had a special-relationship-based duty to take reasonable, minimally burdensome steps to avoid the harm to the plaintiff. (*Id.* at pp. 246, 250.) Having concluded that separating the potential combatants was necessary, and knowing that the step taken to do so would not effectively separate them, the defendant had a duty to take other minimally burdensome steps. Such steps could have included trying to maintain that separation by trying to keep the assailant from leaving on the

particular act, or foreseeability might be shown by the occurrence of similar nonidentical events." (*Wiener, supra*, 32 Cal.4th at pp. 1150–1151.)

[17] Several of the relevant cases are premises liability cases. Appellant insists that the special relationship in this case arises not from the premises but from respondent's relationship to appellant. Nothing in the case law suggests that the source of the special relationship is significant. Once a special relationship is established, the same tests apply whether the relationship is based on a business-patron or residential host-guest relationship.

plaintiff's heels or, at least, checking to be sure that the security guard who was supposed to be on duty in the parking lot was at his post. (*Id.* at pp. 246–247.)

In *Morris*, the plaintiff was assaulted by gang members while he was in his car in the defendant's parking lot waiting for friends who had gone into the defendant's restaurant to buy some food. The defendant's employees could see the assault developing through the restaurant's plate glass windows. At one point, one of the assailants ran into the restaurant's kitchen area and took a knife that he used to stab the plaintiff. When the plaintiff escaped, the assailants tracked him down and continued the assault. The employees did nothing to prevent or respond to the assault even though they could have dialed 911 without being seen by the assailants. *Morris* explained *Delgado, supra*, 36 Cal.4th 224, as holding that even where there is no duty to provide a security guard, a business still "owes a special-relationship-based duty to under take reasonable and minimally burdensome measures to assist customers or invitees who face danger from imminent or ongoing criminal assaultive conduct occurring upon the premises." (*Morris, supra*, 36 Cal.4th at p. 270.) The court noted that the obligation to prevent possible future criminal conduct requires a higher degree of foreseeability than one's obligation "to *respond* reasonably to criminal conduct that is *imminent* or even *ongoing* in his or her presence." (*Id.* at p. 271.) Accordingly, the defendant, through its employees, had a duty to at least call 911 to summon aid for the plaintiff. (*Id.* at p. 264.)

What is apparent from all these cases analyzing defendants' liability for the criminal conduct of a third party is that foreseeability is the crucial factor (*Delgado, supra*, 36 Cal.4th at p. 237) and that—no matter whether a heightened or lesser degree of foreseeability was required and no matter whether the actual crime committed or only similar conduct needed to be foreseen—foreseeability must be measured by what the defendant actually knew. None of these cases has held that a defendant owed a duty to take steps to prevent or respond to third party crime on the basis of constructive knowledge or information the defendant should have known. We are not aware of any case involving liability for third party criminal conduct that has held that a special relationship creates a duty to investigate or that has charged a defendant with making forecasts based on the information such an investigation might have revealed.

Accordingly, we disagree with appellant's argument that respondent's liability is governed by what she should have known rather than what she

actually knew.[18] Appellant supports her argument by citing the statement in *Delgado* that a defendant's duty "is premised upon the danger that the defendant *knows or reasonably should anticipate*, and that the defendant's duty is simply to take reasonable steps *in light of those circumstances*." (*Delgado, supra*, 36 Cal.4th at p. 247, fn. 27.) But *Delgado* makes it clear that it is talking not about unknown predicate facts on which one could base a better forecast, but rather reasonably anticipating "the danger of which the defendant was or should have been aware" (*ibid.*) given the facts the defendant knew. The debate between the majority and the dissent that prompted *Delgado*'s footnote 27, concerned whether it was necessary to foresee precisely "the vicious group attack that occurred" or enough to foresee that a smaller attack would occur, and the majority concluded that "the circumstance that the precise size of the actual gang attack that occurred may not have been reasonably foreseeable does not absolve defendant of the duty to take reasonable steps based upon the nature of the danger that its employee could (and, indeed, did) foresee." (*Ibid.*)[19] This passage may support an argument that, in appropriate circumstances, a duty can be premised on the foreseeability of a harm different from the one that actually occurs, so long as it is closely enough related to the harm that occurs. For example, in our case, even if an attack by all three boys was not foreseeable, a duty could arise if a sexual assault by any one of them was sufficiently

---

[18] Relying on that argument, appellant has asked the court to take judicial notice of an extensive set of studies reporting on research into the prevalence of rape, links between drinking and rape, and males' attitudes that may contribute to rape. These are offered to support what appellant argues respondent should have known. We do not find the proffered studies helpful to our analysis for several reasons. First, and most importantly, there is no evidence that respondent was aware of any of the proffered studies; therefore, they are not relevant. Second, we have no way of verifying whether the specific information they contain is accurate or reliable, let alone that the specific information is common knowledge. Third, they were not submitted to the trial court, which at least could have chosen to hold a hearing to determine whether they would be proper subjects for judicial notice assuming they were otherwise relevant. And, fourth, appellant's logic is flawed because, even accepting that many rapes are associated with alcohol abuse or that alcohol abuse increases the chance of rape, that does not make rape likely in any particular situation involving alcohol. Nevertheless, we recognize that rape in general and sexual attacks on minor girls in particular are heinous crimes that are all too prevalent in our society and that all appropriate steps should be taken to protect the potential victims of such crimes. We also understand that underage drinking is unlawful and dangerous for any number of reasons, including that people under the influence are less aware of their surroundings and less able to take care of themselves. Indeed, as respondent told her daughters, "alcohol can reduce their ability to deal with sexual advances."

[19] Appellant also quotes *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 57 [192 Cal.Rptr. 857, 665 P.2d 947] (*Bigbee*), for the proposition that foreseeability " 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.]" *Bigbee*, however, involved ordinary negligence, not third party crime. Moreover, *Bigbee* analyzed foreseeability as a jury question (*id.* at p. 56), not the legal question presented by the duty analysis in our case. In any event, this quotation again relates to how likely an outcome is, not to the data on which one bases that prediction.

foreseeable. But *Delgado* does not undermine the conclusion that foreseeability, whether heightened or reduced, is tested by what the defendant knows, not what the defendant could have or should have learned.

It follows that our application of the legal principles to this case must begin with an analysis of what respondent actually knew as events unfolded on December 12. First, although respondent denied knowing appellant was drunk, it is reasonable to infer that respondent knew appellant had been drinking and that it was at least likely she was drunk. Her own daughter had made herself ill with drink during an evening spent with appellant, who respondent knew would drink when given access to alcohol,[20] and the evidence suggests respondent told the police that she was told the girls were drunk.[21] Respondent also knew that appellant and Lauren "went to a party with a bunch of people" after telling Alexis that "Brianna wasn't their responsibility." The implication, confirmed by Lauren, was that the girls left voluntarily. Respondent thought they "were at a big group party." By virtue of appellant having made the call to Alexis, respondent knew that appellant had access to a telephone and was able to use it. Respondent knew that appellant was not alone and that at least Lauren was with her. Finally, respondent knew that the girls wanted to return to her house, but that neither girl had a car or would be able to drive.

Equally important in this case are circumstances that did not exist or facts that respondent did not know. Respondent did not know that the girls had left with boys. Respondent did not know any of the assailants or anything about any of them. There is no evidence that appellant knew the boys were drunk. There is no evidence that any of the assailants had any propensity to commit sexual assaults or had ever even been in any kind of trouble.[22] There is no evidence of any prior similar incidents of teenage sexual assault involving

---

[20] Respondent knew appellant drank alcohol in respondent's home a number of times, including once when respondent served alcohol to her, and had gotten drunk at least twice. Appellant suggests that respondent had a duty to inform appellant's parents about these prior episodes. Whatever one might say about the wisdom or the ethics of respondent's acceding to appellant's request that respondent not tell appellant's parents about this drinking, one can say that on those occasions there was no reason to foresee that the failure to inform on appellant would result in injury to appellant, and certainly no reason to foresee that it would result in sexual assault. Therefore, there was no legal duty to do so in the context of this case.

[21] Respondent objected to, and therefore the court excluded, only nonparty statements in the police report. Respondent's statement on this subject, confirmed by the police officer to whom she made it, met the exception to the hearsay rule for a party admission. (Evidence Code section 1220). In her deposition, however, Alexis testified that she did not recall telling respondent that the girls were drunk, which was the only way respondent would have known.

[22] This fact distinguishes our case from *Romero* where the boyfriend had a history of misconduct at school, including sexual harassment of female students, and arrests for vandalism. (*Romero, supra*, 89 Cal.App.4th at p. 1074.) Even there, however, his history was not relevant because the defendants did not know about that misconduct. (*Id.* at p. 1088.)

students at the high school all these children attended together or, for that matter, in the general geographic area. And that is so even indulging the assumption that this could hardly have been the first time boys and girls who had too much to drink were alone together.[23] There is no evidence that respondent knew that the girls were at a boy's house. She did not know where the girls were or that the two girls were alone with three boys, and she did not know whether there was any adult supervision where appellant was.[24]

Because appellant had chosen to leave respondent's house, respondent could not observe what was happening. Neither the attack nor the events leading up to it happened on premises respondent controlled. The only information she had was what Alexis relayed to her.[25] When appellant called Alexis, appellant did not feel threatened physically or sexually, she and Lauren had been enjoying the night with the boys, and appellant had to be talked into wanting to leave Josh's house. Her discomfort by the end of the call had nothing to do with an assault being likely, but with the fear that she would get in trouble with her parents.[26] Even if it was true that appellant could not take care of herself, that information was never conveyed to respondent. Appellant never called back to report that circumstances had changed.

Respondent did not know that appellant had no transportation. Respondent testified that she thought that if the girls could get back to her house, they

---

[23] Appellant makes much of the earlier unauthorized Valentine's Day party at respondent's house when appellant and others had too much to drink and when respondent discovered two other teenagers together in bed in one of the bedrooms. There is no evidence that those two teenagers, who were not involved in the events of December 12, were drunk or that they were unclothed or engaging in any sexual misconduct, let alone that any rape was occurring. Nor was there evidence that any of the assailants were at that party. The participants and circumstances of that party cannot have put respondent on notice as a matter of law that the very different circumstances with which she was confronted on December 12 would foreseeably end in rape.

[24] The complaint alleges that Josh's parents were away on vacation, but there is no evidence in the record concerning that allegation. Although Lauren stated in her first declaration (but not her second) that appellant told Alexis where they were, Alexis did not remember whether she knew whose house the girls were at or whether there were parents at that house. In any event, there is no evidence that she conveyed any information on that subject to respondent.

[25] The evidence does not support appellant's argument that Alexis relayed what appellant said word for word. To the contrary, Alexis testified that she passed on only a very limited portion of what appellant told her. In her deposition, Alexis testified: "I said to [respondent], 'The girls want to know if they can come back.' That's all I said." That is consistent with respondent's testimony concerning the call.

[26] The girls' conversation provides an important indicator of the kinds of harm that were foreseeable. They discussed the risk that appellant would not get to the next morning's driving school and that her parents would learn that she had spent the night with boys, for which she would be severely punished. They did not discuss any risk that the boys would get out of line or that the girls would be unable to protect themselves.

must have a ride. She was not told and did not understand that they were asking for transportation assistance. Indeed, the only reasonable interpretation of her telling them to go home is that she assumed they could do so.

██ Because respondent did not know who appellant was with and did not know that the boys had a propensity to sexually assault girls, the rape was not foreseeable under the heightened foreseeability standard. That means that respondent had no duty to take burdensome steps to prevent a conceivable rape from happening. But the question remains whether a sexual assault was sufficiently foreseeable based on what respondent actually knew to impose a duty on respondent to take the less burdensome steps appellant suggests would have prevented the tragedy—steps such as telephoning appellant's parents, 911, or a taxi company. We conclude she had no such duty.

*Delgado* and *Morris* found a duty to undertake minimally burdensome steps despite the lack of "heightened foreseeability" in circumstances very different from those presented in this case. Those cases turned at least in part on a distinction between steps necessary to *prevent* third party crime and steps necessary to *respond* to imminent third party crime where the events unfolded in front of the defendants. The duty to try to maintain a separation between combatants in *Delgado* required the landlord to continue a course of action he had already undertaken in response to a threat he had identified where the assault progressed on his property. The duty was to take minimally burdensome steps "to respond to events unfolding in [defendant's] presence." (*Delgado, supra,* 36 Cal.4th at p. 245.) The duty to call 911 in *Morris* was similarly tied to the landlord's employees being able to watch the events unfold through his front windows. The duty imposed was "to assist customers or invitees who face danger from imminent or ongoing criminal assaultive conduct occurring upon the premises." (*Morris, supra,* 36 Cal.4th at p. 270.) Although each case found a duty without requiring that the defendant be aware of the attacker's propensity to assault or of prior similar incidents on their property, in each case it was far more than merely conceivable that a criminal assault would occur based on what the defendants actually knew and could see. Here, no criminal assault was occurring or imminent when appellant called Alexis. There was nothing suggestive of an imminent assault unfolding in front of respondent to which she could respond.[27]

---

[27] The most one can say is that, even if respondent knew all the facts concerning appellant's situation at the time of the phone call (which she did not), it may have been foreseeable that the children in this case would engage in the kind of physical intimacy with which teenagers are forever trying to experiment and that parents are forever trying to prevent, but nothing respondent could have heard or seen would have put her on notice that a criminal assault was impending. As *Romero* put it, no authority "requires adults to assume that a male teenage invitee will sexually assault a female teenage invitee simply because the adults are away from the house for an hour." (*Romero,* 89 Cal.App.4th at p. 1088.) The point is no less valid where the female invitee has chosen to leave the house with an uninvited male schoolmate,

Even if we got past that threshold barrier and followed the analytical path blazed by *Delgado* on its facts—evaluating the existence and scope of any duty by applying the test derived from *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561], which we have described as the "gold standard" for determining "common tort liability," (*Juarez, supra,* 81 Cal.App.4th at p. 401;[28] see *Delgado, supra,* 36 Cal.4th at p. 237 & fn. 15)—we would reach the same result. The *Rowland* factors relevant on our facts include foreseeability, the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, and the extent of the burden on the defendant and the community of imposing liability. (*Delgado, supra,* 36 Cal.4th at p. 237 & fn. 15.)

The most important factor remains foreseeability. For the reasons already discussed, the kind of harm suffered by appellant, even if conceivable, was not foreseeable based on what was known to respondent. (See *Romero, supra,* 89 Cal.App.4th at p. 1092.) Respondent, knowing only that appellant and a friend had gone to a party with a bunch of other teenagers and that appellant may have had too much to drink, was not required to predict or to act on the assumption that appellant could not get home, as teenagers routinely do from such parties, let alone that she would be criminally assaulted, given the lack of any evidence that such assaults were a risk at teenage parties among appellant's schoolmates or in that area.

The remaining relevant factors do not overcome the lack of foreseeability. Although appellant certainly alleges severe injury, the connection between respondent's conduct and the injury is tenuous. At the last point when respondent was invited to intervene, there were no signs of danger. No attack had begun or been threatened. The girls' choices, including not leaving or calling their parents, and the boys' supervening criminal conduct were far more direct and significant causes of the injury than anything respondent failed to do.

Nor should moral blame attach to respondent. She made arrangements for the girls to be in safe company and imposed rules that would have kept them safe. She did not invite the attackers into her house; nor did she supply or authorize liquor. Although it may be regrettable that she, among others, did

notwithstanding the added element of alcohol. Nothing about these boys' histories or the situation as it then existed required respondent to assume that the boys were going to commit sexual assaults. It is not enough that the harm be merely conceivable.

[28] As previously noted, *Juarez, supra,* 81 Cal.App.4th 377, applied this test only in analyzing potential liability for a distinct tort. See note 15, *ante. Romero* applied the test only in analyzing potential liability for misfeasance (*Romero, supra,* 89 Cal.App.4th at pp. 1090–1096), which likewise is not relevant to this case involving allegations of nonfeasance.

not make some phone calls in light of what eventually happened that night, respondent did not know many significant facts, and she was not in a position to foresee what happened. She was preoccupied tending to her sick daughter, who had been abandoned by appellant. The law cannot expect or require a calm reaction in the midst of such excitement or confusion. (See *Morris, supra,* 36 Cal.4th at p. 275.) Appellant's mother agreed that given appellant's maturity it was alright for a host mother to be out of the house for several hours during an evening so long as she was not out for the entire night. Going out for dinner and to a party and making her first priority the care of her own sick child was not morally blameworthy, especially given the reasonable assumption that appellant had others to turn to for help if she needed it.

Certainly there is no higher responsibility than protecting our children, and many people in respondent's position might well have chosen to make some phone calls, but that does not equate to a tort law duty of care to protect an invitee who has chosen to leave one's home. (See *Romero, supra,* 89 Cal.App.4th at p. 1094.) The burden of protecting a child in someone else's home is far greater than in one's own home. And the consequences to the community of imposing such a continuing burden as to anyone invited into one's home are not insignificant. As *Romero* recognized, such a burden and its "potential for ruinous tort liability" would create a cloud of suspicion over all teenagers and would deter parents from allowing children to interact in their homes with the likely impact of encouraging such interactions to take place less safely somewhere else. (*Id.* at pp. 1094–1095.) For all these reasons, having considered and balanced the *Rowland* factors, we would conclude that respondent had no legal duty to take action to try to prevent the assault on the facts of this case.

### 3. *Liability Based on a Voluntary Undertaking*

"[A] volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Delgado, supra,* 36 Cal.4th at p. 249.) Appellant argues that respondent undertook the duty to supervise appellant and to advise appellant's parents of any problems she encountered.

First, this argument does not add anything to the analysis of this case. The Supreme Court has suggested that if the elements of a voluntary undertaking are satisfied, that is another way of creating a "special relationship."

(*Williams v. State of California* (1983) 34 Cal.3d 18, 28 [192 Cal.Rptr. 233, 664 P.2d 137].) As we have said, whatever the source of a special relationship may be, the same tests apply to determine whether a duty exists. See footnote 17, *ante*. At most, the existence of a voluntary undertaking satisfying the conditions for liability would lead us to analyze the *Rowland* factors. (*Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1079–1080, 274 Cal.Rptr. 342.) We have done so *ante* and concluded that there was no duty.

In any event, we do not believe respondent undertook to provide any protective services to appellant beyond what she undertook by inviting appellant into her home. "[T]he scope of any duty assumed depends upon the nature of the undertaking." (*Delgado, supra*, 36 Cal.4th at p. 249.) Hiring a security guard for a particular assignment does not undertake a general duty to protect invitees. (*Id.* at pp. 249–250.) The scope of any assumed duty must be measured by what respondent actually undertook to do.[29] (*Romero, supra*, 89 Cal.App.4th at p. 1090; see *Weissich v. County of Marin, supra*, 224 Cal.App.3d at p. 1079 [analyzing voluntary undertaking in part based on what defendant promised].) Just as in *Romero* the plaintiffs knew and understood that the defendants would not personally supervise the victim at all times during her visit (*Romero* at p. 1090), appellant knew that respondent would be away, and appellant's mother understood that respondent could be away for a significant part of the evening. Indeed, the entire reason for the sleepover was to provide company for Brianna while respondent was out. What respondent undertook to do was host a sleepover at which the girls would be on their own in her house, without any other guests or alcohol, until she returned from her party. As we have held, by inviting appellant into her home on that basis, respondent formed a special relationship with appellant. But, beyond whatever duty arose from her special relationship to her invitee, which we have already analyzed, on the facts of this case she did not undertake to provide any greater protective services to appellant.[30]

---

[29] Much of appellant's argument on this issue is premised on respondent's testimony on the subject of duty, which the trial court excluded, and on the request for judicial notice, which we do not find helpful for reasons already discussed. Therefore, we disregard those parts of the argument.

[30] It should also be apparent that respondent did nothing to increase the risk of harm to appellant. Respondent did not invite the boys, supply the alcohol, or induce appellant to leave the house. Indeed, she expressly forbade all of that conduct. Nor, given that appellant voluntarily chose to leave the house and remove herself from the location where respondent could supervise her, can appellant claim that she reasonably relied on respondent's undertaking.

## IV. DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondent.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied May 23, 2006, and appellant's petition for review by the Supreme Court was denied July 26, 2006, S144323.