Filed 6/17/15; pub. order 7/16/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Z.V., a Minor, etc., | |
| Plaintiff and Appellant, | G050922 |
| v. | (Super. Ct. No. RIC10019957) |
| COUNTY OF RIVERSIDE, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Affirmed.

Shernoff Bidart Echeverria Bentley, Michael J. Bidart, Gregory L. Bentley and Steven Schuetze; Rizio & Nelson and Gregory G. Rizio for Plaintiff and Appellant.

Smith Law Offices, Douglas C. Smith and Nathan A. Perea; Arias & Lockwood and Christopher D. Lockwood for Defendant and Respondent.

\*          \*          \*

# I. INTRODUCTION

Z.V., then 15 years old and in foster care, was sexually assaulted by Riverside County social worker Sean Birdsong on September 21, 2009. In this lawsuit, Z.V. seeks to hold Birdsong's employer, Riverside County, responsible for the assault under the doctrine of respondeat superior, which is legalese for the vicarious liability of an employer. Z.V. relies primarily on *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202 (*Mary M.*). The *Mary M.* case held that a female motorist stopped late at night by a city police officer on suspicion of drunk driving and subsequently raped by that officer could sue the city under a theory of respondeat superior.

As we explain below, there is considerable doubt that *Mary M.* has any applicability beyond the narrow context of an arrest performed by a uniformed, armed police officer in the normal course of that officer's duties. (See *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 304 (*Lisa M.*) (maj. opn.) [noting that *Mary M.*'s holding was "expressly limited"].) However, even if *Mary M.* might apply to cases beyond the "unique" position of police officers (see *Mary M., supra*, 54 Cal.3d at p. 206), the undisputed facts take this case out of its reach. Birdsong was not Z.V.'s assigned social worker, he merely volunteered to transport Z.V. to a new foster home at the end of the workday. The sexual assault took place after 8:30 at night, several hours after Birdsong's shift would have normally finished, and after he had already completed the task of delivering Z.V. to the new home without incident. It was several hours after the delivery that Birdsong went back to pick up Z.V. under the pretext of building "rapport," took him to a liquor store and then to Birdsong's own apartment, where the attack took place. Accordingly, we affirm the judgment.

# II. FACTS

This case comes to us after a grant of summary judgment, so our facts are mostly taken from what Z.V. admitted, as the party opposing the motion. Where Z.V. has attempted to qualify a substantially undisputed statement, we have used his version,

2

not Riverside County's. As with all summary judgment motions, inferences from and conflicts within the evidence are drawn in favor of the opposing party, here Z.V., so if there is a spin in our rendition of the facts, it is in Z.V.'s favor.[1] (We have also included a few additional background facts from Z.V.'s own complaint, filed in October 2010.)

In September 2009, Z.V. was within the custody of the Riverside County Department of Public Social Services (DPSS), which had removed him from his parents. He had an assigned social worker named Rebecca Seolim. On the afternoon of September 21, Seolim had just taken Z.V. to the DPSS office in Moreno Valley. Apparently he had been at his grandparents' home, but, since they were physically unable to care for him, Seolim picked him up from their home at about 1 p.m. to take him to the Moreno Valley office. Seolim then spent the greater part of the afternoon attempting to find a new foster home placement for Z.V. She finally found one near the end of the afternoon. However, Seolim was unable to take Z.V. to the new home immediately because a family emergency came up. Birdsong "jumped up really quick" – Z.V.'s own description – and said he would take Z.V. to the new placement. Birdsong said that because he lived closer to the new placement than Seolim, he could perform the task. For his part though, Z.V. immediately sensed that Birdsong had a sexual interest in him. Z.V. told Seolim that he didn't want to go with Birdsong because "there was something about him I didn't trust." However, despite his vocalized mistrust, Z.V. was told by other social workers in the office that if he didn't go with Birdsong "they were going to call the police." The threat accorded with the office's own understanding that dependent minors such as Z.V. had to comply with social workers' directives.

---

[1] Some of the facts are taken from Birdsong's own testimony, much of the point of which is that Birdsong's *state of mind* – at least right up to the time of the sexual assault – was to act in Z.V.'s best interest. Obviously such testimony is self-serving. Even so, we incorporate it at various points in the narrative. Our job is not to make credibility calls, but to ascertain whether Riverside County would be entitled to win the case even if a reasonable jury believed all the evidence in Z.V.'s favor, including Birdsong's.

Birdsong and Z.V. departed the Moreno Valley DPSS office at 5:30 p.m., when both Birdsong's and Seolim's shifts would normally be ending. The trip to the new foster home took about 30 minutes. When they arrived, Birdsong dropped off Z.V. at the new home. Birdsong understood his duties in dropping off Z.V. were to enter the new home, do an assessment, and make sure all placement papers were completed. The drop-off was completed without incident. Birdsong went to a pharmacy, bought alcohol, and then went to his apartment and began drinking.

Some time between Birdsong's return to his apartment and 8:30 p.m. that evening Birdsong called the new foster home and asked to retrieve the top copy of a 20-page packet of papers he had left at the new home. During this phone conversation Z.V. asked to speak with him. Z.V. told Birdsong he didn't want to be at the new home, he wanted to be in a different placement. Birdsong told Z.V. to stay there – Birdsong wanted to prevent Z.V. from running away – and Birdsong would travel to the new home to make sure "everything's going well." Z.V. had run away from other placements before and Birdsong wanted to prevent Z.V. from running away again. Besides, he said, social workers also have a custom of "often" calling juveniles like Z.V. at night to ascertain how a placement is going. Likewise, social workers have the authority to contact foster parents after hours to discuss a child or missing paperwork.

The upshot of the call was Birdsong's directive to Z.V. to put his stuff by the front door and go outside. At the time, however, there was no new placement to which Z.V. might have been taken.

Birdsong came to the new foster home in a county van, thinking he was acting in Z.V.'s best interest in doing so.[2] Birdsong, smelling of alcohol, picked up Z.V. near the foster home somewhere between 8:30 p.m. and 9:00 p.m. He made no attempt to

_____

[2] This is an example of resolution of conflicts in favor of the opposing party. The new foster parent declared that when Z.V. got off the phone with Birdsong, Z.V. told her that Birdsong was coming to rape him. Z.V. disputed this fact in the motion, so the resolution goes to Z.V., i.e., he didn't express a concern of an impending sexual assault to the new foster mother.

4

pick up any paperwork, but picked up Z.V. and drove to Birdsong's apartment. Birdsong went upstairs while Z.V. stayed in the van. Even at this point, Birdsong believed he was performing his job and acting in Z.V.'s best interest in trying to build "rapport" with him. Birdsong then took Z.V. to a liquor store, where Birdsong purchased more alcohol while Z.V. stayed in the van. Then they went back to Birdsong's apartment, and went inside, where Birdsong sexually assaulted Z.V. Z.V. then went outside, contacted bystanders who called the police, and Birdsong was soon arrested. Z.V. sued both Birdsong and the County of Riverside about 13 months later. The court granted Riverside County's motion for summary judgment in April 2013. Judgment was filed in June 2013followed by a timely appeal in August.

## III. DISCUSSION

### A. *Respondeat Superior and Mary M.*

The fifth word in the opening sentence of *Mary M.* is "unique." The point of that sentence is to emphasize the "unique position" of police officers in our society, including the right to arrest and "use deadly force." (*Mary M., supra*, 54 Cal.3d at p. 206.) And given the unique position of armed law enforcement officers, the facts in *Mary M.* were certainly bad: The plaintiff was driving home alone after midnight when a police sergeant employed by the City of Los Angeles stopped her for erratic driving. He was in uniform. He was on duty. He wore a badge and carried a gun. He was driving a marked black and white police car. (*Id.* at p. 207.) He radioed a message saying he was conducting an investigation, asked the plaintiff for her driver's license and gave her a field sobriety test on which she did not "do well." (*Ibid.*) The plaintiff began to cry and pleaded with the sergeant not to take her to jail. He ordered her to get in the front seat of the car, and drove her to her home. Once there, he told the plaintiff he expected "'payment'" for taking her home instead of jail. The plaintiff tried to run away. The police sergeant grabbed her hair and threatened to take her to jail. He then raped her. (*Ibid*.)

5

The plaintiff sued the city on a respondeat superior theory. A jury awarded her $150,000 against the city, but a divided appellate court held that, as a matter of law, the officer was acting outside the scope of his employment, hence there could be no respondeat superior liability on the part of the city. (*Mary M., supra*, 54 Cal.3d at p. 208.) The California Supreme Court then took the case.

A divided high court[3] then reversed the appellate court majority, ruling the city could indeed be held liable for the errant officer's conduct since that conduct was not "so divorced" or "so unusual" to the "enterprise" of police work that it could be said, as a matter of law, that he was acting outside the scope of his employment. (See *Mary M., supra*, 54 Cal.3d at p. 214.)

We have already noted the major theme of *Mary M.*, trumpeted in its opening sentence – the unique position of police officers with their ability to arrest and use deadly force. Other themes woven into the majority opinion were the entrustment in police officers of a "substantial degree of authority" (*Mary M., supra*, 54 Cal.3d at p. 210), the similarity of the facts to garden-variety police brutality cases where there is no question of respondeat superior liability on the part of an officer's employer (*id.* at pp. 215-216), the qualitative difference in authority between police officers and others in authority such as teachers (*id.* at p. 216),[4] and the connection between the officer's act and "'the very exercise'" of his authority over the motorist plaintiff (*id.* at p. 210). Further, the majority noted the "substantial benefits that the community derives from the lawful exercise of police power." (*Id.* at p. 217.) The court might as well have quoted Lord Acton's famous dictum on power corrupting. The court's point was that with authority comes the possibility of abuse. (*Id.* at pp. 217-218.) And yet, lest the case be

---

[3] Justice Kennard authored the majority opinion, joined by Justices Mosk, Broussard, Panelli and Arabian. Justice Baxter, joined by Chief Justice Lucas, concurred on the theory the city could not appeal because of invited error, but disagreed on the respondeat superior theory.

[4] The contrast between officers and other authority figures, such as teachers, was made while distinguishing *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438 (*John R.*), which involved a teacher molesting a student at an extracurricular event.

read for more than it was meant to say, in a footnote toward the end of the opinion the majority once again emphasized "the unique authority vested in police officers." (*Id*. at p. 218, fn. 11.)

The reiteration of the uniqueness of police authority in *Mary M.'s* footnote 11 would reverberate in two successor high court opinions navigating the legal intersection of sexual assault and respondeat superior. Both resisted the invitation to *extend Mary M.*'s approach to sexual assaults by employees other than police officers.

First came *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992 (*Farmers*). There, the high court held that a county was not responsible for the sexual harassment of a county jailer directed at a fellow jailer. The majority opinion in *Farmers* was written by Justice Baxter, the dissenter in *Mary M.* The *Farmers* majority stated that "*except* where sexual misconduct by on-duty police officers against members of the public is involved" the "employer is not vicariously liable to the third party [victim] for such misconduct." (*Id*. at p. 1006, italics added.) That limiting statement garnered five votes.[5] Justices George, Baxter and Chief Justice Lucas would have gone further and overruled *Mary M.* outright.[6]

*Lisa M., supra,* followed on the heels of *Farmers*. *Lisa M.* held that a hospital was, as a matter of law, not responsible for the sexual molestation of a pregnant patient by an ultrasound technician after the patient was taken to the hospital's emergency room. Justice Werdegar, writing for the same five-justice majority who

---

[5]    Chief Justice Lucas, and Justices Arabian, George and Werdegar joined Justice Baxter as the majority in *Mary M.* Justices Mosk and Kennard each wrote separate dissenting opinions.

[6]    Justice Arabian, who had voted with the *Mary M.* majority wrote separately in *Mary M.* to emphasize his particular empathy with victims of sexual assault. The line that has the greatest application to the case before us is this one, which yet again emphasizes the uniqueness of the police: "Our holding today advances the cause of reform by providing a meaningful civil remedy to the victims of those who exploit unique institutional prerogatives to facilitate a sexual assault." (See *Mary M., supra*, 54 Cal.3d at p. 224 (conc. opn. of Arabian, J.).) Given that vigorous concurrence, it is not surprising Justice Arabian did not join three of his colleagues in calling for the overruling of *Mary M.*

decided *Farmers* (with the same two dissenters),[7] based the decision on this rule: "As with [previously discussed] nonsexual assaults, a sexual tort will not be considered engendered by the employment unless its motivating emotions were fairly attributable to work-related events or conditions." (*Lisa M., supra*, 12 Cal.4th at p. 301.) In *Lisa M.*, the ultrasound technician "simply took advantage of solitude with a naïve patient to commit an assault for reasons unrelated to his work." (*Ibid*.) The *Lisa M.* majority distinguished *Mary M.* on two grounds: First, its holding was "expressly limit[ed]" to the "'unique authority vested in police officers,'" (*id*. at p. 304, quoting from *Mary M., supra*, 54 Cal.3d at p. 218, fn. 11). And second, a police officer's assaults "may be foreseeable from the scope of his unique authority," but the same could not be said for an ultrasound technician. (*Id*. at p. 304.)

While *Mary M.* survived calls to overturn it outright, we are unaware of any Supreme Court case that has ever applied it beyond the "unique" – *Mary M.* seems joined at the hip with that word – context of police officer abuse of power in the course of performing official duties within the ordinary scope of that officer's normal duty. In fact, confirmation that *Mary M.* has been so corralled is found in the second major case on which Z.V. relies in this appeal, *Lu v. Powell* (9th Cir. 2010) 621 F.3d 944 (*Lu*). *Lu* held that the United States, as employer of a federal immigration officer, *could* be held liable under California tort law for the officer's sexual assaults on two asylum applicants – at least insofar as the torts of intentional infliction of emotional distress and violation of right to asylum were concerned. (*Id*. at pp. 949-950.)[8]

We will discuss *Lu* in detail three paragraphs from now. For the moment it is enough to note the *Lu* majority expressly *declined* to base its decision on *Mary M.*

---

[7]    Justice George, joined by Chief Justice Lucas, again reiterated his call to overrule *Mary M.* (*Lisa M., supra*, 12 Cal.4th at p. 306.) Justice Baxter, however, did not reiterate his disagreement with *Mary M.* the way he had in *Farmers*.

[8]    The *Lu* majority explained that federal law would not allow the United States to be liable for all the torts that might arise from the immigration officer's sexual assault, see *Lu, supra*, 621 F.3d at pp. 949-950.) Those two torts, however, could survive.

because it also perceived, like the Supreme Court majority's in *Farmers* and *Lisa M.*, that the *Mary M.* decision was limited to the police. Once again footnote 11 from *Mary M.* was quoted as the clincher: "We do not rely on *Mary M.* here, because liability in that case depended on 'the unique authority vested in police officers.'" (*Lu, supra*, 621 F.3d at p. 947, quoting *Lisa M., supra*, 12 Cal.4th at p. 304, quoting *Mary M. supra*, 54 Cal.3d at p. 218, fn. 11.)

However, let us assume, for sake of argument, that *Mary M.* is not strictly confined to police contexts, and that it could possibly even apply to social workers. Could it then apply here to make the question of whether Birdsong's sexual assault on Z.V. occurred in the course and scope of his employment at least a triable issue of fact? We think not. In the case before us, the timing and circumstances of Birdsong's sexual assault on Z.V. show clear firebreaks separating his sexual assault from the one in *Mary M.* Birdsong had no *authorized* duties to perform vis-à-vis Z.V. when the assault took place. Appellant has offered only Birdsong's imagination to establish he had some sort of professional reason to call up Z.V. and visit him. No facts show Birdsong was ever requested by anyone in the department to do anything for Z.V. beyond simply driving him to his new placement. And even that – as shown by the fact he "jumped up really quick" to volunteer for the job – was a matter of his own initiative.

Moreover, when the attack occurred, Birdsong's normal shift had been over for several hours. By contrast, the sexual assault in *Mary M.* took place in the course of the police sergeant's normal shift, while performing the very sort of duty he was authorized by his employer to regularly perform – arresting drunk drivers late at night. Put another way, unlike Birdsong, the sergeant in *Mary M.* didn't *assign himself* the duty of arresting the plaintiff, or do it in his off hours.

Now to *Lu*. Under the relevant federal tort claim statute the question of whether the United States, as the employer of the errant immigration officer, was responsible for the officer's torts is a question of the tort law of the state where the tort

9

occurred. In *Lu* the torts occurred in California so the Ninth Circuit looked to California law on the respondeat superior question. (See *Lu, supra*, 621 F.3d at p. 948, citing *Williams v. United States* (1955) 350 U.S. 857.) As we have noted, the *Lu* court expressly did not rely on *Mary M.* We may also note here that the *Lu* majority did not invoke a vulnerability rationale even though the two asylum seekers were certainly extremely vulnerable to the immigration officer's abuse of his powers – one can only imagine their fate if he sent them back to China. Even so, the *Lu* majority recognized that vulnerability had been expressly rejected as a reason to impose respondent superior liability in *Lisa M.* (*Lu, supra*, 621 F.3d at p. 949.)

So, if the *Lu* majority did not rely on either *Mary M.* or the vulnerability of two asylum seekers to the abuse of an officer's power, what did they rely on to hold an employer liable for sexual assault under California tort law? A close reading of *Lu* reveals three distinct prongs of analysis: (1) The *Lu* majority used an "incident to" test for respondeat superior liability (*Lu, supra,* 621 F.3d at p. 949); (2) The *Lu* majority believed a single California appellate decision supported their decision, and (3) the *Lu* majority shored up its determination by citing three general policy goals: assuring victim compensation, risk spreading, and incentivizing prophylactic measures. We examine each prong now in turn.

The first prong is the assumption the California test of respondeat superior is "the extent to which the tort of the employee is incident to his employment." (*Lu, supra*, 621 F.3d at p. 949.) For this rule, the *Lu* majority cited – but we hasten to note, did not actually quote – page 298 of the *Lisa M.* opinion as it appears in the official reporter.[9] Since the two assaults were incident to the officer's work in evaluating candidates for asylum, his employer could be held liable for them.

_____

[9]     The page citation in the opinion was to volume 907 of the Pacific Reporter Second series, page 362. Thanks to the ease of computer legal research, one can quickly ascertain that page 362 of the Pacific Reporter Second corresponds with page 298 of the official reporter.

10

We must respectfully part company with the *Lu* majority's "incident to" employment" test as a proper characterization of California respondeat superior doctrine. Without further qualification, the "incident to" test is too amorphous and inclusive, particularly if applied in a vacuum. Even the most permissive respondeat superior case involving workplace sexual assault, *Mary M.*, didn't frame its test in terms of whether the attack was incident to the perpetrator's employment. Rather, *Mary M.* asked itself whether the sexual assault there was "*so* divorced" or "*so* unusual" – our emphasis – from the employee's employment that it exceeded the employee's "scope of employment." (*Mary M., supra*, 54 Cal.3d at p. 214, italics added.) Thus *Mary M.* recognized that while sexual assault is an extraordinary, abnormal event in any workplace context, the focus would be on the *extent of abnormality*. By contrast, incident to employment ignores the normal-abnormal dichotomy and allows respondeat superior liability to be based merely on an abstract relationship to employment, however tenuous.

Second, the citation to *Lisa M.* as standing for an unqualified "incident to" test distorts what *Lisa M.* actually said. The point cite given by the *Lu* majority shows the *Lu* decision was alluding to a quotation in *Lisa M.* from *Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960. We now quote the entire paragraph in which that quotation appears to show that, in context, the *Lisa M.* court was actually positing a more *restrictive* test than an unqualified incident to employment test administered in a vacuum. Here is what *Lisa M.* actually said: "The nexus required for respondeat superior liability – that the tort be engendered *by or arise from the work* – is to be *distinguished from 'but for' causation*. That the employment brought tortfeasor and victim *together in time and place* is not enough. We have used *varied language* to describe the nature of the required *additional link* (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an "outgrowth" of the employment (*Carr v. Wm. C. Crowell Co.* [1946] 28 Cal.2d 652, 657); the risk of tortious injury must be "'inherent in the working environment'" (*id*. at p. 656) or "'typical of or broadly incidental to the

11

enterprise [the employer] has undertaken'" (*Hinman v. Westinghouse Elec. Co.*[, *supra*,] 2 Cal.3d [at p.] 960)." (*Lisa M., supra*, 12 Cal.4th at p. 298, italics added.)

As the italicized words show, the reference to "incidental" in the quote from *Hinman* is to establish that the nexus between the tort and employer's responsibility must be rooted in the nature of the employer's enterprise, not just based on a time and place link "incidental to" employment. And indeed, in the very next paragraph after the one merely alluded to by the *Lu* court, *Lisa M.* quoted language from *Hinman* that would *rule out* any respondeat superior liability for an employee's act as outrageous as sexual assault: "Respondeat superior liability should apply *only* to the types of injuries that "'as a practical matter are *sure to occur* in the *conduct of the employer's enterprise.*'" (*Lisa M., supra*, 12 Cal.4th at p. 299, quoting *Hinman, supra*, 2 Cal.3d at p. 960, italics added.) "Sure to occur" is far removed from "incident to."

And third, there is no way an unqualified "incident to" test can be squared with the actual holdings of two California Supreme Court decisions involving sexual assault and respondeat superior. If the test were "incident to," those cases would have gone the other way.

Most dramatically, in *Lisa M.*, the ultrasound technician was employed to perform examinations on pregnant women, a task which necessarily would bring him within inches of his patient's intimate parts. Intimate and physical contact with women patients was part of his job, thus there would be easy opportunities for sexual molestation *incident to* his lawful duties. But the high court said his molestation was most assuredly not within the scope of his employment in *Lisa M.*, thereby indicating that a causal "incident to" relationship would necessarily *not* be enough for respondeat superior liability.

An "incident to" test is also inconsistent with the result in *John R.* because the sexual molestation of a student by his teacher could also be loosely said to be incident to the teacher's employment. In *John R.*, the assault took place in the context of an

12

extracurricular activity (a work experience program where students would assist teachers) that was officially sanctioned.  (See *John R., supra*, 48 Cal.3d at pp. 441-442.)  And in *Farmers* there was not a physical sexual assault, but verbal harassment of one employee by another expressed in workplace conversations – and conversations between employees at a workplace are far more incidental to their employment than the physical assault of an asylum seeker by an immigration officer.

Finally, we note the *Lu* majority did nothing to distinguish the "host" of California Court of Appeal decisions collected by the dissenting judge which *did* involve sexual assault or molestations, and which uniformly held that there was no respondeat superior liability for them.  (See *Lu, supra*, 621 F.3d at pp. 954-955 (dis. opn. of Bybee, J.).)  In fine, we find the first basis for *Lu* unconvincing.

The second prong of the *Lu* majority was reliance on a single California appellate decision:  *Inter Mountain Mortgage, Inc. v. Sulimen* (2000) 78 Cal.App.4th 1434 (*Inter Mountain*).  *Inter Mountain* was not a sexual assault case.  It originated with a real estate agent, working for a broker, who submitted a fraudulent loan package to a lender.  When the lender incurred losses on the inflated and unsupportable loan, the California Court of Appeal held that whether the agent was acting in the course and scope of his employment for the broker was a question of fact for the jury.  (*Id*. at pp. 144-1442.)

The relevant passage from the *Inter Mountain* opinion emphasized the *close nexus* between the agent's fraud and his work for the employer-broker.  The fraud occurred in the course of the very activity for which he was hired (as in *Mary M*. but not in the facts before us now) and – this should not be overlooked – the fraud was facilitated by the *very fact the agent had an employee relationship with the* broker, because that

13

employment relationship by itself gave the defrauded lender the confidence to underwrite the (inflated) loan.[10]

Here is the way the *Lu* majority interpreted *Inter Mountain* to hold that the employer of a federal immigration officer who sexually assaulted two asylum seekers was responsible for the officer's sexual assault: "Like the loan broker, Powell [the errant immigration officer in *Lu*,] was part of a process in which he was expected to participate in a lawful way, reviewing the documentation of the asylum applicant, interviewing her, and assessing the credibility of her claims. Like the loan broker, Powell [the officer] abused his powers for his own benefit. In doing so, he acted within the scope of his employment as defined by California." (*Lu, supra*, 621 F.3d at p. 949.)

That's it. One sentence invoking the fact an employee might be part of a lawful process, followed by another sentence alluding to an abuse of powers and a punch line amounting to an ipse dixit. The same lines could have been written in any one of the many California appellate and Supreme Court cases that have specifically rejected application of respondeat superior in sexual assault, harassment and molestation situations. *All* employees are part of a lawful process and the assault cases often involved some sort of abuse of power as well, whether the power be that of a medical technician over a possibly injured patient (*Lisa M.*), or a teacher over a student not doing well in school (*John R.*), or a priest over a minor parishioner (*Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453). This cannot be enough.

---

[10] Here's the two-paragraph passage: "We conclude there was an abundance of evidence that Baskaron was acting within the scope of employment when he committed the alleged fraud. . . . [B]askaron was employed by Sulimen from September 4, 1994, until May 1, 1995. . . The Brown loan application was submitted on an American Frontier loan application form. Escutia [a representative of the plaintiff] stated in her declaration that throughout the period of November 1994 through March 1995, Baskaron represented to her that he was an American Frontier loan representative and real estate agent; and *based on such representations, Escutia processed the Brown loan. . . .* [¶] According to this evidence, the alleged fraudulent loan transaction occurred during Baskaron's employment with defendants as a loan representative. And, according to Escutia, Baskaron led her to believe that *when* he submitted the Brown loan to Inter Mountain Mortgage, *he was performing his job duties as an American Frontier loan representative.* Under such circumstances, *a nexus existed* between Baskaron's alleged tort, the fraudulent loan transaction, and his employment as a loan representative." (*Inter Mountain, supra*, 78 Cal.App.4th at pp. 1441-1442, italics added.)

14

The third prong of the *Lu* decision comprised three general policy goals one often finds woven into discussions of duty in the tort law. After the *Lu* court pronounced the conclusion that the immigration officer had "acted within the scope of his employment as defined by California" – just quoted above – it invoked three policy ideas. Here is the rest of the paragraph: "To compensate his victims, spread the loss, and stimulate the government to greater vigilance in controlling aberrant behavior, California law makes the United States bear the cost of Powell's conduct, unauthorized but incidental to the asylum system." (*Lu, supra*, 621 F.3d at p. 949.)

In the context of whether respondeat superior liability should apply, the first of these ideas – assuring compensation – is really nothing more than a conclusion. Respondeat superior always helps to assure victim compensation, if only by bringing in another – usually deeper – pocket to provide that compensation. By itself, assuring victim compensation is nothing more than a statement of a desired *result*, not a means of analysis. The real question is *whether*, under California law, the employer's presumably deeper pocket should have to bear the loss of an employee's tort, and that question requires an analysis of the nexus between the employer's enterprise, the employee's scope of employment, and the nature of the underlying tort itself. In fact, carried to its logical conclusion, the goal of "assuring victim compensation" could be readily accomplished by abolishing the law of torts altogether and substituting some sort of no-fault scheme for all losses.

The second goal – spreading the loss – is likewise unhelpful in ascertaining respondeat superior liability. Like assuring victim compensation, if spreading losses is a reason by itself to impose liability, the same goal could be accomplished through a no-fault system. But more significantly, to the degree that the goal of risk spreading does implicate something analytically useful, namely the question of whether a given tort is insur*able*, this consideration directly cuts *against* the *Lu* majority's result. Of all torts, sexual assault is about the *least* amenable to risk-spreading via insurance because of its

15

"inseparably intentional" nature. (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1608; see generally *Gonzalez v. Fire Ins. Exchange* (2015) 234 Cal.App.4th 1220, 1242 [collecting many cases showing lack of coverage]; e.g., *J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1018 [no homeowners' insurance coverage for child molestation as a matter of law].)

The final goal – stimulating an employer to guard against aberrant behavior – *does* advance respondeat superior analysis, because it requires one to inquire about the nature of an employee's normal duties and the measures an employer might take to prevent aberrant behavior such as a sexual assault. To be sure, for example, an employer might take the protective measure – common to many doctors' offices – of not allowing some employees to ever be alone with some third parties. Even so, consideration of protective measures ultimately runs up against the fundamentally intentional nature of sexual assault.

Even if persuasive, *Lu* would not be binding on this court. (*People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn 3.) But in this case we must conclude the opinion is not persuasive. It is not accurate either as a statement of California law or as an application of it.

B. *Negligent Supervision*

Of course, even if Riverside County is not, as a matter of law, vicariously liable under a respondeat superior theory, it is still possible that it could be directly liable for its own conduct in negligently hiring or supervising Birdsong.[11] To establish negligent supervision, a plaintiff must show that a person in a supervisorial position over

---

[11] That has now been clearly established by our high court in *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 867 (*C.A.*). There the high court held a school district could be liable for a high school's head guidance counselor's sexual relationship with a student based on negligent supervision and retention where, inter alia, the district knew or should have known of counselor's propensity or disposition for sexual acts with her students. It is worth noting, however, that *C.A.* came to the Supreme Court on demurrer, so the universe of facts bearing on the case were those set out in the complaint. Those facts included the remarkable allegation that there was some basis on which to surmise that the guidance counselor was inclined or disposed to commit sexual acts with her students. (See *id*. at p. 866.)

16

the actor had prior knowledge of the actor's propensity to do the bad act. (*Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141, 156-157 [based on what mother who hosted sleepover of daughter's friends actually knew at the time of crime against daughter's friend by third parties, there could be no liability for negligent supervision]; *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1080 (*Romero*) ["For reasons we shall explain, we hold that notwithstanding the special relationship between the Romeros and the teenage invitees, the Romeros did not owe a duty of care to supervise Ryan at all times during her visit, to warn her, or to protect her against Joseph's sexual assault, because there is no evidence from which the trier of fact could find that the Romeros had prior actual knowledge of Joseph's propensity to sexually assault female minors."]; *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 395 [rejecting claim against Boy Scouts of negligent "selection, supervision and retention" of scoutmaster where "there was no information accessible to the Scouts that would cause them to suspect" that the scoutmaster "had a propensity to molest children"].)

Here, as in these cases, there are no facts that might have shown propensity or disposition on Birdsong's part to sexually assault a foster child. And, since the case comes to us on a motion for summary judgment, it is a reasonable assumption that Z.V. has had ample opportunity to discover whether Riverside County had some prior knowledge of a propensity on Birdsong's part to sexually assault the county's dependent children.

The strongest fact we have in that regard was Z.V.'s own hesitancy to go with Birdsong on the afternoon he was transported to the new foster home, but the nature of that hesitancy – Z.V.'s fear he was sexual prey for Birdsong – was not outwardly expressed by Z.V. The most Z.V. said was there was "something about him I didn't trust."

For its part, the opening brief seems to realize that this single incidence of expression of mistrust cannot establish negligent supervision, so the brief relies on this

17

one fact:  Birdsong drove a county van with a county insignia on it.  The use of the van, says the brief, "constitutes a total lack of supervision or ineffective supervision."  We cannot agree.  There is nothing about the fact a licensed social worker, employed by a county was driving a van owned by that county, that shows any *propensity* for sexual misbehavior.

The most that can be extracted from the fact the county allowed Birdsong a van is that it gave him an implement which he used to lure Z.V. into a position where he could sexually assault Z.V.  (And actually, it wasn't even that:  Birdsong didn't lure Z.V. into his van, he simply used the van to transport Z.V. to his own apartment.)  This argument still fails because propensity is a function of human psychology, not an inanimate instrument which might help facilitate an attack, as illustrated by *Margaret W. v. Kelley R.* (2006) 139 Cal.App.4th 141 (*Margaret W.*), *Romero, supra*, 89 Cal.App.4th 1068, and *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 (*Chaney*).

In *Margaret W.*, a high school girl went to a sleepover at a friend's house and drank too much there, but then left the house in the company of a girlfriend and some boys, and then was later brutally raped by the boys.  She might not have suffered the attack if she hadn't been allowed alcohol at the girlfriend's house – that is, the home and the alcohol certainly were part of the chain of causation in the events leading up to the attack.  Even so, the mother of the sleepover host was entitled to summary judgment because of the absence of any evidence the mother knew of any propensity of the boys to commit sexual assaults.  (*Margaret W., supra,* 139 Cal.App.4th at pp. 158-159.)  And instrumentalities furnished by defendants played even greater roles in *Chaney* and *Romero*, where the attacks actually took place in the defendants' homes after the plaintiff had been invited there.  Nevertheless, the absence of knowledge of propensity precluded liability.  (See *Romero, supra*, 89 Cal.App.4th at pp. 1080-1084; *Chaney, supra*, 39 Cal.App.4th at pp. 156-158.)  Here, there is a weaker nexus between Birdsong's use of a

van and the eventual attack than there was between the homes in *Margaret W.*, *Romero* and *Chaney*.

## IV.  CONCLUSION

Despite the fact the law offers no opportunity for Z.V. to seek relief from Riverside County, we are not unmindful of the trauma experienced by Z.V. on Birdsong's account.  We fully agree with the sentiments expressed by Justice Arabian in his concurring opinion in *Mary M.* that sexual assault is a violation of the self and an indignity that "cannot ever be fully righted."  (*Mary M., supra*, 54 Cal.4th at p. 222 (conc. opn. of Arabian, J.).)  So we have no intention of further aggravating Z.V.'s trauma.  Though we affirm the judgment in favor of the county, we exercise our own discretion to depart from the usual rule that the loser pays costs on appeal.  Here each side will bear its own costs.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.


19

Filed 7/16/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Z.V., a Minor, etc., | |
| Plaintiff and Appellant, | G050922 |
| v. | (Super. Ct. No. RIC10019957) |
| COUNTY OF RIVERSIDE, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Respondent. | |

Respondent has requested that our opinion in this matter, filed June 17, 2015, be certified for publication. After reviewing the request, we have concluded the case indeed meets the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(2), (4) and (6), the request is GRANTED.

The opinion is ordered published in the Official Reports.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.